The CITY OF NEW YORK, Plaintiff,

v.

BERETTA U.S.A. CORP., et al., Defendants.

No. 00 CV 3641.

United States District Court, E.D. New York.

Dec. 2, 2005.

Corporation Counsel of the City of New York, by Melanie Ash, Richard J. Costa, Eric Proshansky, Gail P. Rubin, New York, NY, Brady Center to Prevent Gun Violence, Legal Action Project, by Jona-

than E. Lowy, Elizabeth Schickedanz Haile, Brian J. Siebel, Dennis A. Henigan, Washington, DC, Center for Constitutional Litigation, by Robert S. Peck, Washington DC, Thelen Reid & Priest, LLP, by Michel S. Elkin, Gabriel Mark Nugent, New York, NY, For Plaintiff City of New York.

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, by Lawrence S. Greenwald, Baltimore, MD, for Defendant Beretta U.S.A. Corp.

Friday, Eldredge & Clark, LLP, by Jonann E. Chiles, Jamie Huffman Jones, Little Rock, AK, Renzulli, Pisciotti & Renzulli, LLP, by John F. Renzulli, Leonard S. Rosenbaum, Scott Charles Allan, New York, NY, for Defendant Browning Arms Co.

Jones Day, by Thomas E. Fennell, Mark R. Hall, Joseph Anthony Strazzeri, Kelly J. Hunt, Patrick Carew, Paula Reichenstein, Michael L. Rice, Patrick G. Broderick, Dallas, TX, Pino & Associates, LLP, by Thomas E. Healy, White Plains, NY, for Defendant Colt's Manufacturing Co., Inc.

Budd Larner, P.C., by Bridgette E. Eckerson, Budd Larner, Prescott L. Nottingham, Timothy A. Bumann, Jennifer C. Kane, Kathleen C. Marchetti, J. Clayton Cheshire, Atlanta, GA, for Defendants Forjas Taurus, S.A. and Taurus International Manufacturing, Inc.

Renzulli, Pisciotti & Renzulli, LLP, by Christopher Renzulli, John F. Renzulli, Scott C. Allan, New York, NY, for Defendant Glock, Inc.

Tarics & Carrington, PC, by Michael J. Zomcik, Houston, TX, for Defendant Phoenix Arms.

Wilson, Elser, Moskowitz, Edelman & Dicker, by Robert Laurent Joyce, New York, NY, for Defendant Sigarms, Inc.

Greenberg Traurig, LLP, by Alan Mansfield, New York, NY, Pietragallo, Bosick & Gordon, by Clem C. Trischler, Robert R. Leight, Pittsburgh, PA, Shook Hardy & Bacon, LLP, by Stacey Elaine Deere, Jeffrey Scott Nelson, Tina Marie Schaefer, Kansas City, MO, for Defendant Smith & Wesson Corp.

Wildman, Harrold, Allen & Dixon, LLP, by James P. Dorr, Sarah Liddell Olson, Chicago, IL, Gallagher Gosseen Faller Kaplan & Crowle, by William Edward Vita, Garden City, NY, for Defendant Sturm, Ruger & Co., Inc.

The Chiafullo White Group, LLP, by Christopher M. Chiafullo, Watchung, NJ, for Defendants AcuSport Corp.; Alamo Leather Goods, Inc.; Bangers, L.P.; Bill Hicks & Co.; Brazas Sporting Arms, Inc.; Camfour Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's Supply Co., Inc.; Dixie Shooters Supply, Inc.; Ellet Brothers, Inc.; Euclid Ave. Sales Co.; Faber Brothers, Inc.; Glen Zanders Fur and Sporting Goods Co.; Hicks, Inc.; Kiesler Police Supply, Inc.; Lew Horton Distributing Co.; Lipsey's Inc.; MKS Supply Co.; Riley's, Inc.; RSR Group, Inc.; Ron Shirk's Shooter's Supplies, Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor Corp.; Walter Craig, Inc.; Williams Shooter's Supplies.

Bureau of Alcohol, Tobacco, Firearms and Explosives, Office of Chief Counsel, by Barry Orlow, Esq., Washington DC, for Bureau of Alcohol, Tobacco, Firearms and Explosives.

United States Attorney's Office, Eastern District of New York, by Elliot M. Schachner, Brooklyn, NY, for United States.

**Memorandum and Order Motion to Dismiss On Ground of Prohibitory Statute**

WEINSTEIN, Senior District Judge.

*TABLE OF CONTENTS*

I. Introduction ............................................................. 251

II. Complaint ............................................................... 251

III. Applicability of Act .................................................... 258
 A. Arguments of the Parties ........................................... 258
 1. Defendants' Contention that the Act Bars the Instant Litigation .......... 258
 2. Plaintiff's Contention that the Instant Litigation is Allowed Under an Exception to the Act ............................................. 258
 B. Applicability of Exception to the Instant Litigation ....................... 259
 1. The Act ....................................................... 259
 2. New York Penal Law Section 240.45 ................................ 261
 3. Requirement of a Federal or State Law "Applicable to" the Sale or Marketing of Firearms ......................................... 261
 a. Statutory Interpretation ...................................... 261
 b. Power of Courts to Interpret Laws............................. 264
 c. Legislative History .......................................... 266
 4. Requirement of an Action "in Which" a Manufacturer or Seller Violated a State or Federal Statute ................................ 268
 a. Time When Exception is to be Applied .......................... 268
 b. Lack of Need for Prior Decision that Penal Law 240.45 was Violated ................................................... 268
 c. Adequacy of the Complaint to Raise Exception Issue ............... 270
 C. Conclusion as to Application ........................................ 271

IV. Constitutionality of Act ................................................ 271
 A. Introduction ..................................................... 271
 B. Regional Conflicts ................................................ 272
 1. History ....................................................... 272
 2. The Present Conflict ............................................ 273
 3. Respect for Balancing by Congress ................................ 276
 C. Commerce Clause ................................................ 280
 1. Dormant Commerce Clause ...................................... 280
 2. Legislative History of Act ........................................ 281
 3. Recent Commerce Clause Cases .................................. 283
 D. General Congressional Powers ....................................... 288
 1. Preemption ................................................... 288
 2. Deprivation of Existing Rights; Ex Post Facto ....................... 289
 3. Retroactivity .................................................. 289
 4. Effect on Pending Cases ......................................... 290
 E. First Amendment ................................................. 293
 F. Second Amendment ............................................... 293
 G. Tenth and Eleventh Amendments .................................... 293
 H. Fourteenth and Fifth Amendments ................................... 294
 1. Due Process and Equal Protection ................................. 294
 2. Section 5 ..................................................... 295
 I. Conclusion as to Constitutionality ................................... 297

V. Stays ................................................................. 297

VI. Conclusion; Certification of Interlocutory Appeal; Stay .................... 298

APPENDIX—Protection of Lawful Commerce in Arms Act ...................... 298

## I. Introduction

The City of New York ("City") sues the main suppliers of handguns in the United States ("Gun Industry") seeking injunctive relief and abatement of an alleged public nuisance caused by the Gun Industry's negligent and reckless merchandising. Standing to bring the action is based upon the City's police powers, its public health responsibilities (handguns are the cause of death to a majority of persons in one age-ethnic group) and New York State substantive law and equity. The likelihood of continuing harm to the City and its residents from negligent merchandising of handguns outside the state supports standing. *See, e.g.,* Daniel A. Farber, *Uncertainty as a Basis for Standing*, 33 Hofstra L.Rev. 1123 (2005).

After extensive discovery and pretrial motion practice, trial was scheduled to begin on November 28, 2005. *See* Docket Entries to 1021. Prior decisions had demonstrated a factual basis for the City's suit. *See N.A.A.C.P. v. Acusport*, 271 F.Supp.2d 435 (E.D.N.Y.2003) (findings of fact and law); *City of New York v. Beretta*, 315 F.Supp.2d 256 (E.D.N.Y.2004) (denying motion to dismiss).

On October 26, 2005, the President of the United States approved the Protection of Lawful Commerce in Arms Act, Pub.L. No. 109–92, 119 Stat. 2095 ("PLCAA" or "Act"). The Act, which was immediately effective, requires that a "qualified civil liability action that is pending on the date of enactment ... shall be immediately dismissed." PLCAA § 3(b) (attached as the appendix to this memorandum). The stated purpose is to promptly terminate existing and prevent future "qualified civil liability actions," as defined by the Act.

On the afternoon of October 26, 2005, hours after the Act was signed into law, Defendants moved for a permanent stay and for dismissal. *See* Defs.' Mot. to Dismiss ("Defs.' Mot.") 1 (Docket No. 997). They contend that the Act is constitutional. *See* Defs.' Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply") 14–48 (Docket No. 1032).

Dismissal is opposed by the City on the grounds that (1) the Act is inapplicable because the case falls within an exception to a "qualified civil liability action," and (2), if the Act is applicable to the present litigation, it is unconstitutional. *See* Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Second Mem. in Opp.") 1–3 (Docket No. 1027–1).

The United States has intervened for the limited purpose of defending the constitutionality of the Act. It takes no position on applicability. *See* Br. of the United States Concerning Constitutionality of the Protection of Lawful Commerce in Arms Act ("U.S. Br.") 1; Tr. of Arguments of November 21, 2005 57–58.

The November 28, 2005 trial date has been vacated and a temporary stay entered by this court. *See* Order dated November 7, 2005 (Docket No. 1023). A full hearing was conducted on November 21, 2005. *See* Tr. of Arguments of November 21, 2005. Decision was reserved.

For the reasons described below, defendants' motion to dismiss is denied. The Act is inapplicable to the present litigation. Were it applicable, it would be constitutional. The temporary stay of all proceedings is continued to permit an interlocutory appeal.

## II. Complaint

The basis of the Second Amended Complaint ("complaint") is summarized in the complaint by a "Preliminary Statement" as follows:

1. This is a civil action seeking injunctive relief and abatement of the public nuisance that defendants cause, contribute to and maintain by their marketing and distribution practices.

2. A public nuisance exists in New York in the form of widespread access to illegal firearms, causing harm to the population at large by endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons.

3. All of the defendants manufacture and/or distribute firearms that were possessed or used illegally in New York City.

4. Because virtually every gun used in a crime starts off as a legal firearm, it is evident that guns manufactured by defendant gun manufacturers and distributed by defendant gun distributors are diverted into an illegal gun market catering to juveniles, criminals and other persons prohibited from owning guns.

5. That diversion is a result of defendants' failure to institute appropriate marketing and distribution practices.

6. Defendants have reason to know or should know that (a) some of the firearms they manufacture and/or distribute will be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

7. Reasonable measures are available to ensure that the guns sold and distributed by defendants do not find their way into a secondary illegal market.

8. Defendants could, but do not, monitor, supervise or regulate the sale and distribution of their guns by their downstream distributors or deal-customers. Defendants could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market. Defendants make no effort to determine those distributors and dealers whose sales disproportionately supply the illegal secondary market.

9. Residents of the City of New York are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if defendants followed more prudent merchandising policies.

10. Defendants' sales and distribution practices accordingly cause, contribute to and maintain a public nuisance consisting of a large and ready supply of guns purchased by criminals and used in the commission of crimes.

11. The City seeks injunctive relief requiring defendants to adopt reasonable measures that will reduce the movement of their products into the illegal secondary market, thereby abating the public nuisance. Compl. ¶¶ 1–11 (Docket No. 147).

"Facts" supporting the case were alleged as follows:

### Firearms Violence in the United States and the State and City of New York

56. The United States leads the world in the number of people and in the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares to no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

57. New York City strictly limits the people who may possess guns within the City. In accord with the long-standing recognition that the number of deaths

and injuries in a particular locality is related to the availability of guns, New York City has enacted comprehensive gun laws intended to keep guns out of the hands of juveniles and criminals. The City's laws, among other things, prohibit the possession of firearms without a license; prohibit possession by certain persons, including those previously convicted of a felony, those with mental disorders, and anyone under the age of 21; prohibit the selling of firearms without safety locking devices and written warnings regarding safe firearm storage; require that licensees not purchase handguns without prior written authorization from the New York City Police Department; require written request of the Police Department to purchase more than one gun and require notice to the Police Department when an owner sells his gun. 38 RCNY § 3–01 to 38 RCNY § 6–33.

58. Despite the City's efforts, persons legally prohibited from owning firearms and those without the requisite New York or New York City license are able to obtain, possess and use illegal firearms in New York City. Firearms are by far the preferred method of murder in New York City, and are used in approximately 60% of the murders committed each year. In 1996, 652 people were murdered with a firearm in New York City; in 1997, 465 were murdered with guns; in 1998, 375; and in 1999, 391. Approximately double the number of persons are injured by the criminal use of firearms with over 2,000 criminal shooting victims reported each year in New York City.

59. Firearms are also used in connection with many crimes other than murder. 1998, for example, of the 39,358 reported robberies in the City, 7,640 or approximately 20% involved the use of a firearm. In that same year, of the 2,181 reported felony reckless endangerment cases, 23% involved the use of a firearm and 20% of menacing cases also involved the use of a firearm. These figures are typical of more recent years.

60. In the period from August 1, 1997 through July 31, 1998, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms Tracing Database (the "Trace Database"), traced 8,437 guns used in crimes in New York City. The 8,437 crime guns traced were used in the commission of 433 robberies, 309 assaults/threats, 278 homicides, 143 narcotics crimes, 101 burglaries/thefts/frauds, and 7,123 firearms-related offenses.

61. Of the 8,437 guns traced, 618 were used in crimes committed by juveniles age 17 and under.

62. Defendants manufactured or distributed a large number of guns recovered in crimes committed in New York City and New York State. According to ATF trace data for the last five years, thousands of guns manufactured or distributed by defendants were used to commit crimes in the City of New York. This number includes only guns that were recovered in the course of a crime. The actual number of defendants' "crime guns" used in New York City over the last five years is vastly higher.

*The Primary and Secondary Market for Guns*

63. The firearms market consists of a primary and a secondary market.

64. The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

65. Although there is a legitimate secondary market for firearms, that market also includes an illegal segment made up of private transactions among non-federally licensed individuals.

66. The illegal, secondary market is a significant source of firearms to criminals. Most firearms are acquired by criminals through transactions in the secondary market.

67. Criminals are an important market segment for the gun industry. Recent analyses have shown that 11% of handguns sold between 12996 and 2000 were used in violent crimes by the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

68. Recent analyses have shown that guns move quickly from the legal to the illegal market; 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within 3 years of their first sale. ATF trace data indicates that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime. A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited used or into the illegal market.

69. The firearm trafficking investigations of the New York Police Department–ATF Joint Task Force also indicate that most of the guns purchased in the secondary market were relatively new. Many times the task force members brought brand new guns, many of them still in original boxes with manuals and gun cleaning paraphernalia. The guns seized and investigated almost invariably did not come from retail sources in the City of New York, but came from out-of-state. Few of the guns recovered had been diverted into the illegal market through theft. Firearms can be obtained easily in New York City in the secondary market despite prices that are often two to three times the price charged by legitimate dealers.

### Diversion to the Illegal Market

70. Diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through defendants' marketing practices.

71. Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market through specific sales practices by gun dealers.

72. Defendants have failed to prevent diversion to the illegal market by, *inter alia,* failing to: monitor corrupt dealers; require retail sales only through storefront establishments; limit sales made at gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

### Illegal Sales at Gun Shows

73. Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sales of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and defendants are aware of this loophole.

74. Although a Federal Firearms Licensee ("FFL") selling at a gun show

must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

75. Firearms manufactured, imported or distributed by defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Private Sellers and Other Non-Storefront Sales

76. The law does not require private sellers of firearms—so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate from a storefront—to conduct backgrounds checks or to maintain records that an FFL is required to maintain. This constitutes a loophole for diversion of guns to criminal elements, and defendants are aware of this loophole.

77. Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table dealers through the use of prudent merchandising practices at little cost or loss of business.

78. Firearms that defendants have sold through non-stocking or kitchen-table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Straw Purchases

79. Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a source of firearms for the secondary market. In one recent law enforcement study, more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase. The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

80. A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits as felony. Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

81. Defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices. This result could be achieved at little cost or loss of business.

82. A substantial number of firearms manufactured, imported or distributed by defendants were acquired by a straw purchase, diverted to the secondary market in New York City, and used to cause injury, death or the threat thereof to residents of the City of New York.

### Multiple Sales

83. Guns are diverted to the illegal gun market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the secondary market.

84. Firearms manufactured, imported or distributed by defendants are acquired as part of a multiple purchase, diverted to the illegal market in New

York, and used to cause injury, death or the threat thereof to residents of the City of New York.

### Corrupt FFLs

85. Guns acquired by criminals can be obtained through intentional trafficking by an FFL. Defendants are aware that some FFLs are corrupt and that they should not do business with such dealers, but defendants nevertheless continue selling to such dealers until ATF revokes the dealers' licenses, which often takes years.

86. Guns are diverted to the illegitimate gun market through corrupt dealers. According to a recent ATF study, just 1.2% of dealers accounted for over 57% of the crime guns traced to current dealers in 1998. For example, in 1998, just over 450 licensed dealers had ten or more crime guns with a time-to-crime of three years or less traced to them. In addition, a congressional study of ATF data found that an extraordinary proportion of crime guns were purchased from the same "high crime" gun dealers. The same 137 dealers were the source of more than 34,000 crime guns between 1996 and 1998.

### Other Means of Diversion

87. Guns manufactured, imported or distributed by defendants are stolen from FFLs with poor security arrangements, and FFLs falsely report thefts to conceal trafficking. These guns are diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to the residents of the City of New York.

88. Some manufacturer or distributor defendants sell guns in states where gun regulations are lax. These manufacturers and distributors know or should know that the guns would be taken into New York City to be used illegally. Defendants produce, market and distribute substantially more handguns than they reasonably expect to sell to law-abiding purchasers. They oversupply states with weak handgun controls and restrictions, such as certain southern states along the I–95 corridor, with substantially more handguns than they know or should know will be purchased by legitimate purchasers in those states. Defendants do so with the knowledge that the oversupply will be sold to prohibited purchasers in states, countries and cities, like New York City, which have strong restrictions on the purchase and ownership of firearms. Guns are diverted to the illegal market through sales in states with weak gun control laws to persons who transport the guns to places with strict gun control laws, such as New York City, a fact confirmed by recent ATF data indicating that over 84% of the crime guns recovered in New York City come from out of state. Of these crime guns, the top source states were Virginia (414), Florida (329), Georgia (282), North Carolina (268), South Carolina (224), Pennsylvania (159), Ohio (136), Alabama (106) and Texas (99).

89. Handguns manufactured, imported or distributed by defendants are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of New York. Compl. ¶¶ 56–89.

The complaint alleges that the defendants know about the diversion of handguns to the illegal market, and have the power to minimize this diversion by relatively simple and inexpensive modifications in their merchandising practice, but refuse to make these changes. Compl. ¶¶ 102–112.

A judgment is sought against each defendant jointly and severally that the court:

(a) Issue an injunction abating the public nuisance complained of herein by requiring defendants to:

i) investigate or screen the distributors and/or dealers through which defendants distribute and sell firearms;

ii) monitor, supervise, regulate, and standardize their distributors' and/or dealers' methods of distributing and selling firearms;

iii) conduct research, or heed existing research, that would allow them to better monitor and control the flow of firearms to the illegal market, and then implement the recommended preventive strategies;

iv) establish a more direct distribution system in which defendants remain in control of the distribution of their products;

v) train and encourage their distributors and/or dealers to act lawfully and responsibly to ensure compliance with federal, state, and local laws;

vi) direct and encourage their distributors and/or dealers to refuse to sell firearms under circumstances where the distributor or dealer knows that the firearms will likely not be used for the purchaser's personal use or otherwise will likely not be used for legal purposes;

vii) require their distributors and/or dealers to refuse to sell more than one handgun per month to any person not holding a federal firearms license, and to track sales to enforce this restriction;

viii) require their distributors to sell only to "stocking dealers," *i.e.*, retailers who stock guns for sale from retail stores, and refrain from selling guns over the Internet, at gun shows, or to "kitchen-table" dealers;

ix) require their distributors and/or dealers to certify their compliance with all firearms laws and regulations, and to provide documentation of their sales employees' and agents' eligibility to sell guns;

x) require their distributors and/or dealers to carry a specified minimum amount of liability insurance coverage at all times;

xi) refrain, and require their distributors and/or dealers to refrain, from using any incentive sales practices that reward a salesperson or a purchaser based on sales purchase volume;

xii) require their distributors and/or dealers to meet reasonable, specified security requirements to prevent theft of firearms;

xiii) require their distributors and/or dealers to maintain computerized inventory tracking programs containing detailed information about the acquisition and disposition of every gun, and subject their distributors and dealers to audits of their inventory and to sanctions for any firearms for which the distributor or dealer cannot account;

xiv) require their distributors and/or dealers to maintain records of trace requests initiated by law enforcement agencies, and to report those trace requests to the manufacturer of each firearm traced;

xv) maintain records of trace requests that they receive from law enforcement, and track and analyze where and when in the commercial distribution chain the gun may have been diverted to crime, and take preventive measures to reduce such diversions; and

xvi) institute effective training, monitoring, and sanctions practices to enforce these requirements, including terminating or otherwise effectively

disciplining distributors and/or dealers whom they know or should know distribute firearms into the unlawful market or in an illegal or unsafe manner. Compl. 26–29.

Reasonable counsel fees and costs are sought. Compl. 29.

The complaint is adequate. *See City of New York v. Beretta*, 315 F.Supp.2d 256 (E.D.N.Y.2004) (denying motion to dismiss). Detailed statutes or cases relied upon by a plaintiff need not be cited. *See* Fed.R.Civ.P. 8(a); *Brock v. Superior Care, Inc.* 840 F.2d 1054, 1063–64 (2d Cir.1988) (there is no requirement for statutory citation in complaint).

### III. Applicability of Act

#### A. Arguments of the Parties

##### 1. Defendants' Contention that the Act Bars the Instant Litigation

Defendants' motion to dismiss is grounded on the theory that the Act requires immediate dismissal. *See* Defs.' Mem. in Support of Mot. to Dismiss ("Defs.' Mem.") 1 (Docket No. 998). They point out that the Act prohibits the institution of a "qualified civil liability action" in any state or federal court and provides that any such "action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending." PLCAA § 3(a) & (b).

With exceptions, a "qualified civil liability action" is a "civil action ... brought by any person against a manufacturer or seller of a [firearm that has been shipped or transported in interstate or foreign commerce] ... for damages, ... injunctive or declaratory relief, abatement, ... or other relief, resulting from the criminal or unlawful misuse of [the firearm]." *Id.* §§ 4(4) and 4(5). This litigation, defendants argue, falls squarely within the plain language of a "qualified civil liability action." The City is a "person" as defined by the Act. *Id.* § 4(3) (" 'person' means any ... corporation, ... or any other entity, including any governmental entity"). Defendants are manufacturers and sellers of firearms that have been shipped or transported in interstate or foreign commerce, and are protected by the Act. *Id.* §§ 4(2) (defining "manufacturer"), 4(6) (defining "seller"). Finally, this case—described in the complaint as "a civil action seeking injunctive relief and abatement of [a] public nuisance" that "exists in New York in the form of widespread access to illegal firearms," Compl. ¶¶ 1, 2—is a civil action for relief "resulting from the criminal or unlawful misuse" of firearms shipped or transported in interstate or foreign commerce. *See* PLCAA § 4(9) (" 'unlawful misuse' means conduct that violates a statute, ordinance, or regulation as it relates to the use of" a firearm shipped or transported in interstate or foreign commerce). Because this case falls within the definition of a "qualified civil liability action" prohibited by the Act, defendants seek immediate dismissal of the case, with prejudice. *See* Defs.' Mem. 2.

##### 2. Plaintiff's Contention that the Instant Litigation is Allowed under an Exception to the Act

The City contends that the present action "rests comfortably" outside of the statutory definition of a qualified civil liability action because it falls under section 4(5)(A)(iii) of the Act. That section preserves from dismissal actions in which a firearms manufacturer or seller knowingly violated a state or federal statute "applicable to" the sale or marketing of firearms and the violation was a proximate cause of the harm for which relief is sought. Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss ("Pl.'s First Mem. in Opp.") 2 (Docket No. 1014). According to the City, the com-

plaint and the facts adduced in discovery establish, the pleadings allege, and the trial will place at issue defendants' knowing violation of section 240.45 of the New York Penal Law ("New York PL 240.45"). New York PL 240.45, it is contended by the City, is "applicable to" the sale and marketing of firearms. Furthermore, since conduct violating New York PL 240.45 is precisely the conduct alleged to cause the nuisance, violation of the statute proximately causes the harm for which relief is sought. Pl.'s First Mem. in Opp. 2–3. Because the City's action is one in which a firearms manufacturer or seller allegedly knowingly violated a state statute applicable to the sale or marketing of firearms, which violation proximately caused the harm complained of, the City contends it should not be dismissed. Pl.'s First Mem. in Opp. 3.

Defendants respond that the exceptions in the Act should be construed narrowly and that, as so construed, the City's action does not fall under section 4(5)(A)(iii). Defs.' Reply 10–14. They point out that the general exception created in section 4(5)(A)(iii) for lawsuits based on a knowing violation of a state or federal statute "applicable to" the sale or marketing of firearms is followed by two examples of violations that trigger that exception. *See* PLCAA § 4(5)(A)(iii)(I) (excepting from the definition of a "qualified civil liability action" cases in which a manufacturer or seller "knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to [firearms], or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the ... disposition of a [firearm]"); PLCAA § 4(5)(A)(iii)(II) (excepting cases in which a manufacturer or seller "aided, abetted, or conspired with any other person to ... dispose of a [firearm], knowing or having reasonable cause to be-

lieve, that the actual buyer ... was prohibited from possessing or receiving a firearm"). According to the defendants, the general exception in section 4(5)(A)(iii) is limited to actions of the type described in these two examples, namely, violations of statutes specifically—and explicitly—regulating the manner in which firearms are sold or marketed. *See* Defs.' Reply 10–14. Because New York PL 240.45 is not, defendants contend, such a statute, the City's action does not fall under section 4(5)(A)(iii), is a qualified civil liability action, and must be dismissed.

For the reasons discussed below, the Act is not applicable to the instant litigation.

## B. Applicability of Exception to the Instant Litigation

### 1. The Act

The Act is primarily a set of definitions supporting two directory provisions, one of which bars commencing a defined type of civil action—a "qualified civil liability action"—in state or federal court, and another that directs state and federal courts to dismiss pending civil actions that meet the definition. *See* PLCCA § 3(a) and (b). The directory provisions of the Act's 3(a) and (b) state:

(a) IN GENERAL. A qualified civil liability action may not be brought in any Federal or State court.

(b) DISMISSAL OF PENDING ACTIONS. A qualified civil liability action that is pending on the date of the enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending.

The definition of a "qualified civil liability action" that is a necessary condition for

sections 3(a) and (b) to apply is found in Section 4(5):

(5) QUALIFIED CIVIL LIABILITY ACTION.

(A) IN GENERAL. The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . .

Sections 4(5)(A)(i), (ii) and (iii) provide that qualified civil liability actions *"shall not include"* actions in which specified conduct is placed at issue. (Emphasis added.) Actions that meet the definitions of Section 4(5)(A)(i)(ii) or (iii) are excluded from the scope of the directory provisions. Such actions are, as indicated below, not "qualified civil liability actions" even if they might otherwise meet the definition of Section 4(5)(A). The provision reads:

(5) QUALIFIED CIVIL LIABILITY ACTION.

(A) ... The term "qualified civil liability action" . . . shall not include—

(i) an action brought against a transferor convicted under section 924(h) of title 19, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

(ii) an action brought against a seller for negligent entrustment or negligence per se;

(iii) an action in which a manufacturer or seller of a qualified product *knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the viola-*

*tion was a proximate cause of the harm for which relief is sought, . . . .*

(Emphasis added.)

The general exception in section 4(5)(A)(iii) for lawsuits based on a knowing violation of a state or federal statute "applicable to" the sale or marketing of firearms is followed by two specific examples of statutory violations that trigger that exception. PLCAA §§ 4(5)(A)(iii)(I) and (II) read:

(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

(I) any case in which a manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code.

For ease of reference, section 4(5)(A)(iii) is referred to as the "predicate exception," because its operation requires an underlying or predicate statutory violation. The

"State or Federal statute applicable to the sale or marketing of the product," whose violation serves as the basis for invoking the predicate exception is referred to as a "predicate statute."

### 2. New York Penal Law Section 240.45.

According to the City, the allegations of its complaint and the facts adduced in discovery fall within the predicate exception by establishing a *prima facie* violation of New York PL 240.45, Criminal Nuisance in the Second Degree. Proof of the allegations in the City's complaint, the City contends, will establish that the defendants have committed a knowing violation of New York PL 240.45, and that the violation was a proximate cause of the public nuisance at issue in the City action, so that this action is not a "qualified civil liability action," and not subject to dismissal. *See* Pl.'s First Mem. in Opp. 5–6.

New York PL 240.45 provides:

A person is guilty of criminal nuisance in the second degree when:

By conduct either unlawful in itself or unreasonable under all the circumstances, he knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons; . . . .

### 3. Requirement of a Federal or State Law "Applicable to" the Sale or Marketing of Firearms

#### a. Statutory Interpretation

■ "Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir.2000). In *Dauray*, the Court of Appeals for the Second Circuit determined that where Congress had not defined the terms at issue, the court would "consider the ordinary, common sense meaning of the words." *Id.* *See also Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431–32, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (legislative purpose "is expressed by the ordinary meaning of the words used."); *Escondido Mut. Water Co., v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984) ("[I]t should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses."). "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

■ By its plain meaning, New York PL 240.45 satisfies the language of the predicate exception requiring a "statute applicable to the sale or marketing of [firearms]." As courts have repeatedly held, the term "applicable" means "capable of being applied." *Snyder v. Buck*, 75 F.Supp. 902, 907 (D.D.C.1948). *See also, e.g., Whalin v. Sears Roebuck & Co.*, No. 94 C 1518, 1995 WL 68823, at *3, 1995 U.S. Dist. LEXIS 1838, at *8–9 (N.D.Ill. Feb.13, 1995) ("The common definition of the word applicable is 'capable of or suitable for being applied.'"); *Interwest Constr. v. Palmer*, 923 P.2d 1350 (Utah 1996) (" 'applicable' is defined as 'fit, suitable, pertinent, related to, or appropriate; capable of being applied' "); *Whitney v. American Fidelity Co.*, 350 Mass. 542, 215 N.E.2d 767, 768 (1966) ("Dictionary definitions of the word 'applicable' include the

words 'fit,' 'suitable,' 'pertinent,' 'appropriate,' or 'capable of being applied.' ").

This judicial understanding is buttressed by the ordinary usage described in dictionary definitions. "[T]he Standard Dictionary defines the word 'applicable' as follows: 'Applicable, capable of being applied; suitable or fit for application; relevant, fitting.' Webster's Dictionary contains the following definition: 'Capable of being applied; fit; suitable; pertinent.' Black's Law Dictionary, 3d Ed ... defines the term as follows: 'Applicable, fit, suitable, pertinent, or appropriate.' " *Snyder*, 75 F.Supp. at 907. The Oxford American Dictionary defines "applicable" as "that [which] may be applied." Oxford American Dictionary and Language Guide 42 (1999). *See also Whalin*, 1995 WL 68823, at *3, 1995 U.S. Dist. LEXIS 1838, at *8–9 (citing Webster's Ninth New Collegiate Dictionary for the definition "capable of or suitable for being applied"); *Interwest Constr.*, 923 P.2d at 1359 (citing Black's Law Dictionary, 6th Ed., for the definition "fit, suitable, pertinent, related to, or appropriate; capable of being applied").

Defendants cite the definition of "apply" given in the current edition of Black's Law Dictionary, which is "[t]o employ for a limited purpose; [t]o put to use with a particular subject matter." Black's Law Dictionary 109 (8th ed.2004). Despite defendants' assertion to the contrary, this definition is neither "narrower" than the usual definitions cited above nor "contrary to" those definitions. Defs.' Reply 11. In fact, Webster's Dictionary, relied upon for the definition of "applicable," contains a definition of "apply" similar to that in the current edition of Black's Law Dictionary. *See* Webster's Third New International Dictionary 105 (1993) (defining "apply" as "to use for a particular purpose or in a particular case"). This contrast makes grammatical sense. In any individual in-stance, a court would in fact "apply" a statute to a particular (and therefore limited) purpose. At the same time, however, that statute might be "applicable" to a host of other purposes. A statute's applicability describes the complete range of limited purposes to which it is "capable" of being put and the multitude of subject matters with regard to which it may be used. *See* Black's Law Dictionary 91 (5th ed. 1979) ("The word 'apply' is used in connection with statutes in two senses. When construing a statute, in describing the class of persons, things, or functions which are within its scope ... When discussing the use made of a statute, referring to the process by which the statute is made operative; as where a jury is told to 'apply' the statute of limitation if they find that the cause of action arose before a given date.").

While New York PL 240.45 has not yet been applied to the sale or marketing of firearms, the common law doctrine of public nuisance from which it was derived has been so applied. This court has already held that the City's allegations that the sales and marketing practices of gun manufacturers and distributors have "endanger[ed] ... the property, health, safety or comfort of a considerable number of persons" stated a cause of action for public nuisance. *See City of New York v. Beretta*, 315 F.Supp.2d 256, 277, 283–84 (E.D.N.Y.2004). Likewise, in *NAACP v. Acusport, Inc.*, the court concluded that the evidence presented at trial established that the defendant manufacturers and sellers of firearms were responsible for the creation of a public nuisance. *See NAACP v. Acusport*, 271 F. Supp 2d 435 (E.D.N.Y. 2003) (dismissing the plaintiff's suit despite the public nuisance created by defendants' actions because the plaintiff had failed to establish standing to press the public nuisance claim). *But see People v. Sturm, Ruger & Co.*, No. 4502586/00, 8/17/2001

N.Y.L.J. 18 (N.Y.Sup.Ct. Aug. 10, 2001) (while not rejecting the possibility of a successful public nuisance action based on the manufacture and sale of firearms, dismissing the State of New York's claims on the grounds that the State had failed to adequately allege that the defendants were responsible for creating or maintaining a public nuisance under either the common law or New York Penal Law 240.45).

There is nothing remarkable in the results in *Beretta* and *Acusport.* In accordance with the standard meaning of "applicable," New York courts have repeatedly held that the common law doctrine of public nuisance is "applicable to" the sale or marketing of legal but potentially harmful products. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348 (S.D.N.Y.2005) (upholding public nuisance claims for legal gasoline additives under several states' laws, including New York State law); *United States v. Hooker Chemicals & Plastics Corp.,* 748 F.Supp. 67 (W.D.N.Y.1990) (state could maintain a common law public nuisance action against Occidental Chemical Company regarding the creation of "the public health and environmental disaster at Love Canal"); *Sturm, Ruger & Co.,* No. 4502586/00, 8/17/2001 N.Y.L.J. 18, slip op. at 10 (rejecting defendants contention that the "lawful manufacture and sale of non-defective products cannot constitute a public nuisance"); *State v. Fermenta ASC Corp.,* 160 Misc.2d 187, 608 N.Y.S.2d 980 (N.Y.Sup.Ct.1994) (factual question existed as to whether registrant for herbicide was liable for the creation of a public nuisance); *State v. Schenectady Chemicals, Inc.* 117 Misc.2d 960, 459 N.Y.S.2d 971 (Sup.Ct. Rensselaer Cty.1983) (state could maintain a common law nuisance action to compel a chemical company to pay the costs of cleaning up a dump site). These cases establish that the common law equivalent of New York PL 240.45 is "ap-plicable to," *i.e.,* "capable of being applied to," the sale and marketing of legal gasoline additives, chemicals, and herbicides. Neither the common law doctrine of public nuisance nor New York PL 240.45 are any less "applicable to" the sale and marketing of firearms than they are to other legal but potentially dangerous products.

Defendants argue that the predicate exception must be read narrowly and that, as so read, the City's action does not fall under it. According to the defendants, two canons of statutory interpretation— *"noscitur a sociis"* and *"ejusdem generis"*—require this result. *See* Defs.' Reply 12–13. Under these principles, "[t]he meaning of one term may be determined by reference to the terms it is associated with, and where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated." *Gen. Elec. Co. v. Occupational Safety & Health Review Comm'n.,* 583 F.2d 61, 65 (2d Cir.1978).

As already noted, defendants rely upon the fact that the predicate exception is followed by two narrow examples of statutory violations that trigger it. Section 4(5)(A)(iii)(I) provides that the predicate exception applies in "any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to [firearms], or aided, abetted, or conspired with any person in making any false ... statement with respect to any fact material to the lawfulness of the ... disposition of a [firearm]." Section 4(5)(A)(iii)(II) states that the exception applies in "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to ... dispose of a [firearm], knowing or having reasonable cause to believe, that the actual buyer ...

was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code." Because both of these examples involve violations of statutes specifically regulating the manner in which firearms are sold or marketed, defendants maintain that the principles of *ejusdem generis* and *noscitur a sociis* dictate that the predicate exception itself be limited to statutes of this sort. *See* Defs.' Reply 13.

■ Defendants' reliance on statutory canons is misplaced. The language of section 4(5)(a)(iii) is "clear, broad, and unqualified." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,* 499 U.S. 117, 128, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991). It does not admit of the distinction defendants ask the court to draw, between laws *specifically* regulating the sale or marketing of firearms and laws that, while "applicable" to the sale or marketing of firearms, do not explicitly mention firearms in their text. While "[t]he meaning of particular phrases must be determined in context," *Securities & Exch. Comm'n v. Nat'l Sec., Inc.,* 393 U.S. 453, 466, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the canons of construction cannot be used to avoid plain meaning. *U.S. v. Turkette,* 452 U.S. 576, 582, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("The rule of *ejusdem generis* is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute."); *Harrison v. P.P.G. Indus., Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) ("the rule of *ejusdem generis* is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty ..."); *U.S. v. Powell,* 423 U.S. 87, 91, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) ("The rule of *ejusdem generis,* while firmly established, is only an instrumentality for ascertaining the cor-

rect meaning of words when there is uncertainty."); *Gooch v. U.S.,* 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936) (same).

If Congress had wanted to limit the predicate exception to statutes almost identical to the two examples, it could easily have done so. It did not. Rather than excepting those actions in which a manufacturer or seller knowingly violated a state or federal statute "directly" or "specifically" regulating the sale or marketing of firearms, Congress excepted all actions "in which a manufacturer or seller ... knowingly violated a State or Federal statute applicable to the sale or marketing of [firearms]." PLCAA § 4(5)(A)(iii).

### b. Power of Courts to Interpret Laws

At oral argument, defendants emphasized their position concerning the scope of the word "applicable" as used in the predicate exception. *See* Tr. of Arguments of November 21, 2005, 9–20. It is defendants' contention that, in order to be a "statute applicable to the sale or marketing of [firearms]," the state statute has to explicitly mention firearms; it is not enough that the statute could be construed by state (or federal) courts to include firearms, or even that the highest state court had so construed the statute: the statute must mention the word "firearms" or "guns" or the like. Even were the question of the meaning of New York PL 240.45 to be certified to the New York Court of Appeals and were it to rule explicitly that 240.45 includes firearm merchandising, it could not, defendants contend, comply with the Act—only an explicit state statute could do so.

The oral argument on the motion to dismiss reads in part as follows:

THE COURT: Your position is that even if the Court of Appeals of the State of New York said in a holding that this statute [New York PL 240.45] applies to

straw sales, it would have no bearing on the meaning of the statute in connection with this state law; is that it?

MR RICE: Yes, your Honor.

. . .

THE COURT: If the New York statute [New York PL 240.45] specifically referred to firearms or to straw sales or to both, what would your position be?

MR RICE: Clearly, I think, your Honor, the statute that the act passed by Congress contemplates is a state statute applicable to the sale or marketing of a firearm as well and I suppose requires seeing the actual language that was in the statute, but if there was legislation in the state that dealt with the sale or marketing of a firearm, as I understand your Honor is suggesting, then I certainly think that can come within the exception. It is obviously not the case here. We have a statute, general applicability—

THE COURT: I don't understand why you suggest that the New York Court of Appeals can't construe its own statutes to put in the words, if that's what the meaning attributed to the statute is going to be, this includes straw sales and sale of handguns. Why is the New York Court of Appeals limited in its power to construe a state statute?

MR. RICE: Your Honor, the New York Court of Appeals—let me be clear—is not limited in construing its statute, but it is limited. The way it construes its statute does not control whether or not that statute is one that the United States Congress defined as a federal or state statute applicable to the sale or marketing of firearms. When it defined that and you look at the exception that has the two examples that it gives, it is talking about statutes and regulations of a particular kind that deal with the man-

ner in which firearms are sold and to whom they are sold.

. . .

THE COURT: I just want to get this clear. We have an interesting federalism problem here. A federal statute which depends, as you suggest, on a state statute, and, as I understand your argument, it is the state statute that has to use [ ]—I'll call them magical terms for discussion purposes—"straw sale of handguns" or something like that; it is not enough if there is a statute that the New York Court of Appeals has construed as meaning these quasi magical terms, right?

MR RICE: It is—if I understand what the Court is saying, I think that's right, but again it is not—what we're saying that the . . . New York Court of Appeals is doing and what Congress has done are two separate things. Congress has said the following state and federal statutes are by definition what the exception [covers]. They are the ones that are applicable to the sale or marketing of firearms. By that we mean, by example, theses two sections and the fact that the New York Court of Appeals could at some point turn around and say that 240—

THE COURT: No, no. Supposing it had said it in the past.

MR. RICE: Supposing it had said it in the past, that the criminal nuisance statute of general applicability could—

THE COURT: No. They had a case and they said we hold it includes straw sales in handgun violations and negligence in handgun sales. Supposing we had a New York Court of Appeals holding on the books, is it your position that that holding would not come within the exception?

266

MR RICE: My position is—I'll try it again. My position is there is a fundamental difference. I understand what the New York Court of Appeals has said under your Honor's—under the decision the Court refers to. The New York Court of Appeals has said that the straw purchases and violations of the law that occurred come within the terms of the criminal nuisance statute, that those violations have created a criminal nuisance and that is—and the defendants are subject to liability or subject to being charged under the criminal nuisance statute. With that understanding, again, I do not believe that the holding by the New York Court of Appeals converts the criminal nuisance statute itself into a statute applicable to the sale or marketing of a product.

. . .

THE COURT: You don't doubt the position that the characterization within the statute is a federal issue, right?

MR. RICE: Yes.

THE COURT: Federal court, national issue, but it is a different step to say that the federal courts must ignore a state court interpretation of its statute which makes the statute the exact equivalent of a statute which expressed literally and in terms these words you say are required.

Tr. of Argument of November 21, 2005, 11, 14–15, 16–19.

▪ The defendants' argument misconstrues the relationship of courts and the legislature in New York. The law is not only the language that the legislature adopts, but what the courts construe to be its meaning in individual cases. *See, e.g.,* N.Y. Const. art. 6, § 1 (unified court system); N.Y. Const. art. 6, § 2 (jurisdiction

of Court of Appeals); N.Y. C.P.L.R. § 103 (form of civil judicial proceedings).

The United States Constitution "guarantees" each state a "Republican Form of Government." U.S. Const. art. IV, § 4. And it requires state judges to "be bound thereby." U.S. Const. art. VI, ¶¶ 3–4. Our form of federal and state governments provides for a separation of powers with cooperation by legislatures and courts. It does not give the federal government unlimited authority to transfer state court power to state legislatures or to abolish traditional court powers to construe the meaning of legislation. *See* The Federalist No. 78 (Alexander Hamilton) ("[A]s liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments; that as all the effects of such a union must ensue from a dependence of the former on the latter, not withstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its coordinate branches, [jeopardizing its position] as the citadel of the public justice and the public security.") *Cf. infra* Part IV. D.4 (discussing power of courts to avoid interference by legislature with adjudicative functions).

### c. Legislative History

Both the plaintiff and the defendants rely heavily on the legislative history of the Act to support their different conclusions about the scope of the predicate exception. The City points to the statements of congressional sponsors that indicate that the Act was not intended to grant "automatic immunity" to gun makers and sellers. As its initial sponsor and floor leader stated in the Senate:

This is not a gun industry immunity bill. . . . This bill does not create a legal

shield for anybody who manufactures or sells a firearm. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. It does not prevent them from being sued for their own misconduct.

151 Cong. Rec. S. 9087, 9088 (daily ed. July 27, 2005) (Sen.Craig).

It is not a gun industry immunity bill because it does not protect firearms or ammunition manufacturers, sellers, or trade associations from any other lawsuits based on their own negligence or criminal conduct.

151 Cong. Rec. S. 9059, 9061 (daily ed. July 27, 2005) (Sen. Craig).

It is not the gun industry immunity bill. It is important that we say that and say it again because it does not protect firearms or ammunitions manufacturers, sellers or trade associations from any lawsuits based on their own negligence or criminal conduct. *This bill gives specific examples* of lawsuits not prohibited. Let me repeat, not prohibited: Product liability ... Negligence or negligent entrustment, breach of contract, lawsuits based on a violation of State and Federal law, it is very straightforward, and we think it is very clear.

*Id.* at S. 9065 (emphasis added).

What all these nonprohibited lawsuits have in common is that they involve actual misconduct or wrongful actions of some sort by a gun manufacturer, a seller or a trade association. Whether you support or oppose the bill, I think you can all agree that individuals should not be shielded from the legal repercussions of their own lawless acts.

151 Cong. Rec. S. 9087, 9089 (daily ed. July 27, 2005) (Sen.Craig). *See also id.* at S. 9107 (Sen. Baucus) (explaining that the PLCAA "will not shield the industry from its own wrongdoing or from its negligence"); 151 Cong. Rec. S. 9374, 9395 (daily ed. July 29, 2005) (Sen.Craig)

("This bill will not prevent a single victim from obtaining relief for wrongs done to them by anyone in the gun industry.").

Senator Craig's statements were similar when supporting S. 1805, a virtually identical bill that failed to pass in the 108th Congress:

What this bill does not do is as important as what it does. This is not a gun industry immunity bill. This bill does not create a legal shield for anyone who manufactures or sell firearms. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. It does not prevent them from being sued for their own misconduct. Let me repeat that. It does not prevent them—"them," the gun industry—from being sued for their own misconduct. This bill only stops one extremely narrow category of lawsuits: lawsuits that attempt to force the gun industry to pay for the crimes of third parties over whom they have no control.

150 Cong. Rec. S. 1860, 1862 (daily ed. Feb. 27, 2004) (Sen.Craig).

Defendants rely upon statements emphasizing concern about the "huge costs" borne by defendant gun manufacturers and sellers. As Senator Sessions contended:

Huge costs arise from simply defending an unjust lawsuit. Indeed, such lawsuits, even if lacking any merit and ultimately unsuccessful, can deplete an industry's resources and depress stock prices. Defendant industries must hire expensive attorneys and have their employees spending countless hours responding to the lawyers, providing them information and so forth, and meeting with them.

151 Cong. Rec. S. 8908, 8910 (daily ed. July 26, 2005) (Sen. Sessions).

Sponsoring Senator Baucus reiterated his colleague's concerns:

[T]he time, expense, and effort that goes into defending these nuisance suits is a significant drain on the firearms industry, costing jobs and millions of dollars, increasing business operating costs, including sky-rocketing insurance costs, and threatening to put dealers and manufacturers out of business. That is why this bill is so necessary.

151 Cong. Rec. S. 9087, 9107 (daily ed. July 27, 2005) (Sen. Baucus); *see also* 151 Cong. Rec. S. 8908, 8910 (daily ed. July 26, 2005) (Sen. Sessions) (discussing his fears for the future of hunting in his home state of Alabama if the gun industry were to be "ruin[ed]"). *But cf.* 151 Cong. Rec. S. 8908, 8913–14 (daily ed. July 26, 2005) (Sen. Reed) (finding little basis in fact for the claims of excessive litigation costs to the gun industry).

None of the legislative history cited by the parties answers the present question of statutory interpretation. No one contests what these quotations confirm. It is clear that Congress did not establish automatic immunity for gun manufacturers or sellers. However, the fact that Congress did not grant automatic immunity does not mean that it specifically designed the predicate exception to apply in this case. Likewise, members of Congress were certainly concerned about the high costs of "unjust" or "predatory" lawsuits. But this concern does not make the present litigation an example of a prohibited suit under the Act. What is decisive is the language of the Act itself.

**4. Requirement of an Action "in Which" a Manufacturer or Seller Violated a State or Federal Statute**

**a. Time When Exception is to be Applied**

■ The Act does not specify when in the course of a pending action a court is to determine that an action is a "qualified civil liability action." *See* PLCAA § 3(b). When a filed action on its face appears to be an action against a firearm manufacturer or seller for relief from the criminal or unlawful misuse of a firearm by a third party (*i.e.,* a qualified civil liability action), but the plaintiff asserts that it is "an action in which a manufacturer or seller ... knowingly violated a State or Federal statute applicable to the sale or marketing of [firearms]," that dispute must be resolved before dismissing the action as a "qualified civil liability action." This follows from the design of the statute: if the action is the latter (involving a state or federal statutory violation), it is not the former (a qualified civil liability action), and cannot be dismissed.

Nothing in the language of the Act suggests that a court can address the issue other than under the Federal Rules of Civil Procedure. If the case can come within the predicate exception, the matter is only resolvable pre-trial by a motion for summary judgment under Rule 56(b) or by trial. This conclusion follows because there is no requirement in the Act that violation of the predicate statute be proven prior to the commencement of the putative qualified civil liability action. So long as the City has alleged facts sufficient to establish that the predicate exception applies to its case, the instant action cannot be dismissed prior to trial as a "qualified civil liability action." Whether or not the present litigation *is* a "qualified civil liability action" depends on questions of fact that are currently disputed and must be resolved by trial.

**b. Lack of Need for Prior Decision that New York PL 240.45 was Violated**

■ To sufficiently plead the predicate exception, the pleader need only allege a

knowing violation of a predicate statute, and need not offer evidence of a judgment or completed prosecution. A prior judicial act is not a prerequisite to the applicability of the predicate exception. This conclusion is dictated by the Act's requirement of a "violation" of a state or federal statute and confirmed by the operation of other federal statutes that operate by means of predicate violations.

An instructive federal statutory cause of action dependent upon a predicate violation is the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.,* requiring violations of specified state or federal criminal statutes as an element of a RICO claim. Shortly after RICO was enacted, courts analyzed the statutory language to determine whether a cause of action under the statute required only allegations of predicate violations (followed by subsequent proof in the action itself) or, instead, whether the predicate had to have been proven as a prerequisite to the RICO claim. The Court of Appeals for the Second Circuit, for example, looked to the description of the predicates as "violations" "chargeable" under state law and concluded that Congress intended the RICO predicates to be criminal convictions: "RICO liability simply does not exist without criminal conduct.... [I]n a civil context, there is no way to know whether the conduct in question is 'already criminal' ... We conclude that had Congress considered this problem, it would have explicitly required previously established convictions." *Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482, 501 (2d Cir.1984), *rev'd,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

The Supreme Court rejected the view of the Court of Appeals for the Second Circuit, observing that "[t]he Court of Appeals purported to discover its prior-conviction requirement in the term 'violation'

in § 1964(c)." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 488, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). But, the Court concluded, "the term 'violation' does not imply a criminal conviction. *It refers only to a failure to adhere to legal requirements." Id.* at 489, 105 S.Ct. 3275 (emphasis added) (internal citations omitted). Thus, a civil RICO plaintiff may proceed against a defendant without a prior criminal conviction. *Id.* at 493, 105 S.Ct. 3275.

A similar view has been taken of the Lacey Act, 16 U.S.C. § 3372, which outlaws conduct *"in violation of* any law or regulation of any State or in violation of any foreign law." (Emphasis added.) That language has not been interpreted to require a prior judicial determination about the conduct constituting the predicate offense. Instead, it contemplates proof of the conduct as an element of the Lacey Act prosecution itself. *See, e.g., United States v. McNab,* 324 F.3d 1266 (11th Cir.2003) (trial court instructed jury on Honduran law necessary for conviction); *United States v. Fountain,* 277 F.3d 714 (5th Cir.2001) (government proved violations of state law, thereby proving Lacey Act violation).

The operation of RICO and Lacey and of the Act itself depends upon the ordinary meaning of the term "violation," that is to say, "act[ing] against the dictates or requirements of oath, treaty, law terms or conscience." The Concise Oxford Dictionary 1453 (5th ed.1964). *See also* Black's Law Dictionary 1600–01 (8th ed.1999) (defining "violation" as "the act of breaking or dishonoring the law"); Oxford American Dictionary and Language Guide 1129 (1999) (defining "violate" as to "disregard; fail to comply with"); Webster's Third New International Dictionary 2554 (1993) (defining "violate" as "to break" or "disregard" and "violation" as "the act or action of violating; an infringement or transgres-

sion"). In short, a "violation" is the conduct itself, not that conduct accompanied by some judicial finding, such as a judgment.

A difference in the language used in the three exceptions to the Act's section 4(5)(A) support the conclusion that the predicate exception is part of the necessary proof, not a prerequisite. Significantly, section 4(5)(A)(i), the first of the three types of cases that are not "qualified civil liability actions," is: "(i) an action brought against a transferor *convicted* under section 924(h) of title 18, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct *of which the transferee is so convicted* ..." (Emphasis added.) When Congress wished to require a conviction it so stated explicitly.

By contrast, in the predicate exception, Congress was content to use the word "violation," rather than "conviction." Furthermore, unlike the language introducing the two other exceptions, 4(5)(A)(i) and (ii), which refer to an "action brought," PLCAA § 4(5)(A)(iii)—the provision relied on by the City—defines the excepted "action" as "an action *in which* ..." The meaning of actions "in which" certain facts exist is that the facts need only exist "in" those actions, not that they have already been found to exist in a prior action.

### c. Adequacy of the Complaint to Raise Exception Issue

To establish that the action at bar is not a "qualified civil liability action" because it is within the predicate exception, the City must allege and ultimately prove both that the defendants have knowingly "failed to adhere" to the requirements of New York PL 240.45, *see Sedima*, 473 U.S. at 489, 105 S.Ct. 3275 (defining "violation" as a "failure to adhere to legal requirements"), and that the defendants' violation of that

statute is the proximate cause of the harm for which the City seeks relief. *See* PLCAA § 4(5)(A)(iii). The Act does not designate which party must assume the burden of proof on this issue. For purposes of this motion, the City has assumed the burden of demonstrating that the complaint's allegations bring the action within the predicate exception. *See* Pl.'s First Mem. in Opp. 14 n. 8.

The City's complaint alleges facts sufficient to establish a knowing violation of New York PL 240.45. The violation consists of three elements: 1) the existence of a public nuisance (*i.e.*, a condition "endanger[ing] the safety or health of a considerable number of persons"); that is 2) caused or maintained by the defendants' unlawful or unreasonable conduct; and 3) defendants' knowledge or reckless disregard of the fact that the conduct causes the nuisance.

The complaint alleges that "[a] public nuisance exists in New York in the form of widespread access to illegal firearms, causing harm to the population at large by endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons." Compl. ¶ 2. This sufficiently alleges the first element of New York PL 240.45.

The complaint further alleges that the diversion of firearms into the illegal market "is a result of defendants' failure to institute appropriate marketing and distribution practices," Compl. ¶ 5, and that "[r]easonable measures are available to ensure that the guns sold and distributed by defendants do not find their way into a secondary illegal market." Compl. ¶ 7. In the nuisance context, for purposes of the present motion, a determination that conduct is unreasonable under the circumstances "depends upon whether the gravity of the harm to B is great enough to

outweigh the utility of A's conduct" in operating its business in the manner that gives rise to the nuisance. Restatement 2d of Torts ¶ 830. The gravity of the harm alleged by the City—"[a] public nuisance . . . in the form of widespread access to illegal firearms, . . . endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons"—may very well be found to outweigh the utility of the defendants' conduct in operating their businesses as they do. *See NAACP v. Acusport,* 271 F.Supp.2d 435, 446 (E.D.N.Y.2003) ("The evidence presented at trial demonstrated that defendants are responsible for the creation of a public nuisance and could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns—substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns."). The City's allegations regarding the defendants' conduct satisfy the second element of New York PL 240.45, requiring that the nuisance be caused or maintained by the defendants' unreasonable conduct.

Finally, the complaint alleges that the "[d]efendants have reason to know or should know that (i) some of the firearms they manufacture and/or distribute will be diverted into the hands of those who would violate the law, and (ii) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices." Compl. ¶ 6. It also alleges that the "[d]efendants, through their sales, marketing and distribution practices, have *knowingly* created, supplied, maintained and contributed to an illegitimate market for guns through which criminals, juveniles, and other prohibited users obtain guns that are thereafter used in criminal activity in the City of New York." Compl. ¶ 117 (empha-

sis added). This sufficiently alleges the third element of New York PL 240.45, requiring that the defendants have knowledge of the fact that their conduct causes the nuisance.

Since New York PL 240.45 is essentially a criminal codification of the common law doctrine of public nuisance, the same conduct which the City alleges causes the public nuisance for which it seeks relief— "defendants' failure to institute appropriate marketing and distribution practices," Compl. ¶ 5—comprises an element of the statutory violation, "conduct that is unreasonable under all the circumstances." Because New York PL 240.45 is violated by the same conduct that gives rise to a common law nuisance, the City's complaint sufficiently alleges the proximate cause requirement of section 4(5)(A)(iii).

## C. Conclusion as to the Applicability of the Act

The Act does not require dismissal of the City's action.

### IV. *Constitutionality of Act*

## A. Introduction

The City contends the Act would be unconstitutional if applied as defendants propose to bar the litigation. *See* Pl.'s Second Mem. in Opp. 19–59. Defendants and the United States both contend that the Act is constitutional. *See* Defs.' Reply 14–48; U.S. Br. 3–38. The parties' arguments on this issue run the constitutional gamut from federalism and the separation of powers through due process, equal protection, the First Amendment, and beyond.

Although the parties have delved deeply into current constitutional doctrine, two relatively simple concepts define the dispute and provide a basis for decision. First: It is Congress that decides how to resolve differences among the states and

regions. Here it has arguably done so rationally to favor the needs of the Gun Industry and populations favoring handguns over the needs of the country's major cities. Second: The City is not claiming damages for a violation of a vested right. It seeks only an injunction against future possible violations of state law. No issue of a violation of substantive rights, procedural due process or equal protection of the laws has been raised because no existing entitlement is sought to be redeemed by this litigation.

While the variety of other constitutional issues raised directly and indirectly by the parties and discussed below are in some instances not critical to the decision, together they lend color to the picture of the case's constitutional background.

There is no violation of the United States Constitution. Were the Act to be interpreted as ousting all courts—state and federal—of jurisdiction in the present circumstances, it would in effect be changing both procedural-jurisdictional and substantive law. Congress would arguably not be exceeding its constitutional power by doing so in the Act as applied to the present case. No ruling is made on whether a different jurisdiction-ousting statute would pass constitutional muster.

## B. Regional Conflicts

### 1. History

From the beginning, the country's leaders recognized that each region of this widely dispersed and heterogeneous land has different needs and different views. One of the fundamental reasons The People adopted the constitution was to provide a system for resolving those different needs and views peacefully, primarily through the national legislature. It was understood by the leaders as well as by the ratifying voters that there would be regional and group differences that had to be mediated by the federal government if the nation were not to break apart. *See, e.g.,* The Federalist Nos. 6, 7, 8, 9 (Alexander Hamilton), No. 10 (James Madison); Carl Van Doren, *Introduction* to The Federalist v, xi (Limited Ed. Club 1945) (describing "a time when serious Americans could prefer to see the newly independent states ... become a number of regional confederations"); Stephen Breyer, Active Liberty: Interpreting Our Democratic Constitution 28–30 (2005) (describing the problem of "factions" and the Framers' attempts to solve it); Walter R. Borneman, 1812: The War that Forged a Nation 42 (2004) (describing differences between Western hawks seeking conquest of Canada and Northeastern merchants concerned with peaceful trade on the high seas); Eric Foner, Reconstruction: America's Unfinished Revolution: 1863–1877 311 (Francis Parkman ed.2005) (to the widely conflicting views of Northerners and Southerners was added the conflict between Western farmers' demands for paper currency inflation and Eastern bankers' insistence on hard currency based on gold); John P. Kaminski, *The Empire State: The Antifederalist and Federalist Perspectives,* 1 N.Y. Legal Hist. 147, 148 (2005) (describing New Yorkers' resentments that no one supported them against Vermont's revolt, helped against British occupation, or paid as much as New York to support the national government; one state paid nothing to the Confederation Congress). *But see* Eric Foner, *Richard Hofstadter: Columbia's Evolutionary Historian,* Columbia, Fall 2005, at 39 ("[Richard] Hofstadter's insight [was] that his subjects held essentially the same beliefs. Instead of persistent conflict between agrarians and industrialists, capital and labor, or Democrats and Republicans, broad agreement on fundamentals, particularly the values of individual liberty, pri-

vate property, and capitalist enterprise, marked American history."). That system of regional conflict resolution worked during the "First Republic's" pro- and anti-slavery periods (until it broke down in Lincoln's era); during pro- and anti-tariff industrial and agrarian conflicts in the post-Civil War "Second Republic;" during the poorer versus the richer times of the "Third Republic" under Franklin Roosevelt; and during the period of attempted equalization of classes, ethnic groups, genders, disabled individuals, sexual preference groups and the like in Post World War II's egalitarian "Fourth Republic," starting particularly with President Johnson and civil rights legislation. *Cf.* Michael Lind, What Lincoln Believed 234–35 (2005). The increased power of special interest groups, modern communication techniques, and money has somewhat changed the process, but not the central reliance on Congress and the president to resolve conflicts. The fact, therefore, that legislation may have resulted from differences in interest of various groups and populations is not a critical factor in the interpretation of that legislation or in its validity.

In keeping with our federal system, differences among regions have been considered by Congress since the beginning of the Republic. The modern action of Congress in protecting specific industries such as light aircraft, *see* discussion *infra* Part IV.C.3, coal through Black Lung compensation, 30 U.S.C. §§ 901–62, agriculture through subsidies, and industry through tariffs is well known. Yet the states have also been able to independently express their differing views, adopting, for example, rules on carbon dioxide emissions from cars, clean air acts, and global warming laws differing from each other and from federal policy without impinging on the federal constitution. *See, e.g.*, Danny Hakim, *Battle Lines Set as New York Acts to Cut Emissions*, N.Y. Times, Nov. 26, 2005, at A1 (describing automakers' opposition to New York's likely adoption of strict new emissions standards); Editorial, *Cleaner Cars for New York*, N.Y. Times, Nov. 11, 2005, at A22 (discussing New York's choice to adopt new emissions standards). The issue now addressed is whether congressional limitations on state substantive law *by the mode represented in this Act* violates municipal and state rights.

### 2. The Present Conflict

By means of this lawsuit, New York City seeks to impose limits on possession through controls on dangerous methods of selling handguns. In the complaint, plaintiff offers dramatic statistics, both for the city and the nation, regarding the number of homicides and other crimes involving handguns. It paints a powerful picture of how some members of the firearms industry knowingly profit from illegal commerce in handguns. Plaintiff claims, for instance, that defendants produce, market and distribute substantially more handguns than they reasonably expect to be used by law-abiding purchasers. Particularly oversupplied are those states with weak handgun restrictions, specifically "certain southern states along the I–95 corridor. . . ." Compl. ¶ 88. According to plaintiff, defendants sell excess guns "with the knowledge that the oversupply will be sold to prohibited purchasers in states, counties and cities, like New York City, which have strong restrictions on the purchase and ownership of firearms." Compl. ¶ 88. They allege that "[c]riminals are an important market segment for the gun industry." Compl. ¶ 67.

The complaint quotes Robert Haas, the former Senior Vice President for Marketing and Sales for defendant Smith & Wesson, for the proposition that the gun industry knows that the criminal market is

fueled by the industry's questionable distribution practices:

> The company and the industry as a whole are fully aware of the extent of the criminal misuse of firearms. The company and the industry are also aware that the black market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices....

Compl. ¶ 102. The complaint also quotes Robert Lockett, a firearms dealer named the 1993 Dealer of the Year by the National Alliance of Stocking Gun Dealers, whose article was published in Shooting Sport Retailer, a firearms industry trade magazine, as declaring:

> I've been told INNUMERABLE times by various manufacturers that they 'have no control' over their channel of distribution. I've been told INNUMERABLE times that once a firearm is sold to a distributor, there is no way a manufacturer can be held responsible for the legal transfer and possession of a firearm....
>
> IF YOU DO NOT KNOW WHERE AND HOW YOUR PRODUCTS ARE ULTIMATELY BEING SOLD—YOU SHOULD HAVE KNOWN OR ANTICIPATED THAT THEY WOULD BE ILLEGALLY SOLD AND SUBSEQUENTLY MISUSED.
>
> Let's just get down and dirty. We manufacture, distribute, and retail items of deadly force.... Your arguments of yesterday regarding lack of accountability were pretty flimsy. Today, they are tenuous at best. Tomorrow, they are not going to indemnify you. We are going to have to get a whole lot better—and fast—of being in control of our distribution channel.

Compl. ¶ 104 (emphasis in original).

Plaintiff relies upon provisions of the City's municipal code that place strict requirements and prohibitions on the possession, use, and transfer of firearms in New York and assert that such ordinances can only be effective if current practices which enable—even encourage—illegal diversion from other states because of careless and reckless merchandising are corrected. *Cf.* Editorial, *A Police Death in Brooklyn,* N.Y. Times, Dec. 1, 2005, at A32 ("The gun that killed Officer Stewart was stolen in Florida, and it is hard to say whether stronger laws would have kept it off of the streets of New York."); Andrew Cuomo, Editorial, *Unsafe 'Shield': Why Protect Gun Industry,* N.Y. Post, Nov. 29, 2005, at 33 (editorial decrying the passage of the Act, especially in light of a recent homicide in New York City); Dr. Robert Kurtz, Editorial, *Killed by our Mania Over Guns,* N.Y. Post, Nov. 29, 2005, at 5 (describing the effect of the widespread access to illegal guns on the New York City region).

That the City's view of the danger of careless handgun merchandising is not idiosyncratic is reflected in the lawsuits brought in recent years by various municipalities, the State of New York, and the NAACP, almost all of which are legally indistinguishable from the City's case. *See City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415 (3d Cir.2002); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,* 273 F.3d 536 (3d Cir. 2001); *City of New York v. Beretta U.S.A. Corp.,* 315 F.Supp.2d 256 (E.D.N.Y.2004); *NAACP v. Acusport, Inc.,* 271 F.Supp.2d 435 (E.D.N.Y.2003); *White v. Smith & Wesson* 97 F.Supp.2d 816 (N.D.Ohio 2000); *Dist. of Columbia v. Beretta U.S.A. Corp.,* 872 A.2d 633 (D.C.2005) (en banc); *City of*

*Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099 (2004); *City of Gary v. Smith & Wesson*, 801 N.E.2d 1222 (Ind.2003); *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002); *Morial v. Smith & Wesson*, 785 So.2d 1 (La.2001); *Ganim v. Smith & Wesson*, 258 Conn. 313, 780 A.2d 98 (2001); *People v. Arcadia Machine & Tool, Inc.*, 126 Cal.App.4th 959, 24 Cal.Rptr.3d 659, 663 (2005); *City of St. Louis v. Cernicek*, 145 S.W.3d 37 (Mo. Ct.App.); *Spitzer v. Sturm, Ruger & Co., Inc.*, 309 A.D.2d 91, 761 N.Y.S.2d 192 (N.Y.A.D. 1st Dep't 2003); *Mayor of Detroit v. Arms Tech. Inc.*, 258 Mich.App. 48, 669 N.W.2d 845 (2003); *James v. Arms Tech., Inc.*, 359 N.J.Super. 291, 820 A.2d 27 (2003); *Penelas v. Arms Tech. Inc.*, 778 So.2d 1042 (Fla.Ct.App.2001), *review denied*, 799 So.2d 218 (Fla.2001); *Baker v. Smith & Wesson*, No. Civ. A. 99C–09–283–FS, 2002 WL 31741522 (Del.Super.Ct. Nov.27, 2002); *City of Boston v. Smith & Wesson*, No. 199902590, 2000 WL 1473568 (Mass.Super. July 13, 2000).

Yet there is a fundamental federal legal-political problem posed by any attempt on the part of New York to more carefully control the distribution and ownership of handguns, whether through the exercise of police powers as in the case of licensing, or through criminal, tort or nuisance actions with effects both inside and outside New York. For while urban areas such as New York seek more stringent controls, in rural areas unregulated individual ownership of handguns is prized. As Senator Sessions declared during consideration of the Act:

> I can imagine the impact the ruin of the gun manufacturing industry would have on my home State of Alabama, which is one of the premier States in the Nation for hunting whitetail deer and eastern wild turkey. Hunting is a part of the way of life for nearly 500,000 Alabamans. That is about 1 in 9 of our citizens.

Imagine if they were unable to obtain hunting rifles or ammunition.

151 Cong. Rec. S8908, 9010 (daily ed. July 26, 2005) (Sen. Sessions). The Senator feared for the future of rifle hunting in his state. By contrast, the City of New York, like other cities, seeks to deal with a radically different—and also fundamentally local—concern, namely that human beings, not wild animals, constitute the major species that falls prey to handguns in the metropolitan centers of this country. *See, e.g.,* Compl. ¶ 58 ("Firearms are by far the preferred method of murder in New York City, and are used in approximately 60% of the murders committed each year.").

Here, where what is sought is in essence a court order informing people how to sell handguns more safely in Ohio and elsewhere, there is a conflict between the desire of New York City to protect people within its borders and the desire of other parts of the country to rule themselves. On a more mundane level, private conflict of laws raises much the same problem; this branch of the law recognizes that the laws of some places should affect activities in other jurisdictions. *See* New York C.P.L.R. § 302 (jurisdiction over acts of non-domiciliaries); Willis L.M. Reese & Maurice Rosenberg, Conflict of Laws frontispiece (6th ed. 1971) ("Can the Island of Tobogo pass a law to bind the rights of the whole world?").

In a case such as this one, there is a strong argument for Congressional power to limit state adjudicative jurisdiction and substantive power. New York's claim that the Gun Industry affirmatively relies on, and profits from, the entry of thousands of handguns into the City's illegal secondary market must be juxtaposed against other states' concerns that lawsuits against the Gun Industry might lead to its collapse.

### 3. Respect for Balancing by Congress

■ "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Delineating those bounds "requires a distinction between what is truly national and what is truly local." *Id.* at 617–618, 120 S.Ct. 1740. Such a distinction is essential to our federal system: "Traditionally, the Supreme Court cites three values of federalism: it provides a check on the tyranny of federal power, it fosters governments that are more responsive than Congress to the needs of local citizens, and it uses the states as laboratories to develop new approaches to social problems." Betsy J. Grey, *The New Federalism Jurisprudence and National Tort Reform*, 59 Wash. & Lee L.Rev. 475, 511 (2002).

Modern tort law (defined by common law, statutes, and judicial decisions) is one of the great developments of individual state and national laboratories. Historically, the states have taken different approaches to questions arising under the broader law of torts. *See* John C.P. Goldberg, *The Constitutional Status of Tort Law*, 115 Yale L.J. 526 (2005). As Professor Grey points out, one of the best known examples of this variation involves liability for water overflowing from one's land:

> In *Rylands v. Fletcher*, the English court held that an individual would be strictly liable for damage from any water that escaped from the property owner's land. When the issue was examined in the United States, the English holding met with varying degrees of enthusiasm. The western states, in particular, largely rejected the strict liability theory, finding negligence better suited to their needs:

> > In Texas we have conditions very different from those which obtain in England. A large portion of Texas is an arid or semi-arid region.... The country is almost without streams; and without the storage of water from rainfall in basins constructed for the purpose, or to hold waters pumped from the earth, the great livestock industry of West Texas must perish. No such condition obtains in England. With us the storage of water is a natural or necessary and common use of the land, necessarily within the contemplation of the state and its grantees when grants were made, and obviously the rule announced in *Rylands v. Fletcher*, predicated upon different conditions, can have no application here.

> Thus, the rule was tailored to meet the [particular] conditions of the region....

Betsey J. Grey, *The New Federalism Jurisprudence and National Tort Reform*, 59 Wash. & Lee L.Rev. 475, 513–14 (2002). "State courts historically have 'sung at different pitches' in another important sense: as initiators of 'new torts.'" *Id.* at 514. There are various examples of this phenomenon, including intentional infliction of emotional distress, medical monitoring claims, and invasion of privacy claims. Courts "have also adopted traditional torts to new situations." *Id. See also* Richard Delgado, *Words That Wound: A Tort Action for Racial Insults, Epithets, and Name–Calling*, 17 Harv. C.R.-C.L. L.Rev. 133, 179–81 (1982) (discussing the application of the common law tort of outrage to racial hate speech).

The force of these regional differences is underscored where tort law seeks to address a "public nuisance," which tradition-

ally has been defined as the doing of, or the failure to do, something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public. Where a locality addresses a need to safeguard the health, safety, and morality of its own residents—as it does in the development and application of public nuisance laws—its arguments enjoy substantial force:

> [T]he recognition of an irreducible moral or ethical imperative in tort law reaches the heart of the exercise of state sovereign power, giving the states an irreducible role to play as co-equal norm setters in our federal system. Insofar as state tort law serves this normative function, it is closer to the other areas granted special protection, particularly to criminal law. In that case, Congress's power to federalize tort law is subject to greater scrutiny under the recent federalism decisions.

Betsey J. Grey, *The New Federalism Jurisprudence and National Tort Reform,* 59 Wash. & Lee L.Rev. 475, 535 (2002).

Given the special nature of public nuisance claims, it should come as no great surprise that the state courts have divided when confronted with the question of nuisance actions against the firearms industry. *See, e.g., See City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415 (3d Cir.2002) (affirming dismissal of public nuisance action); *White v. Smith & Wesson,* 97 F.Supp.2d 816 (N.D.Ohio 2000) (allowing public nuisance action to proceed); *City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099 (2004) (allowing public nuisance action to proceed); *City of Gary v. Smith & Wesson,* 801 N.E.2d 1222 (Ind.2003) (allowing public nuisance action to proceed); *City of Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002)

(allowing public nuisance action to proceed); *Ganim v. Smith & Wesson,* 258 Conn. 313, 780 A.2d 98 (2001) (affirming dismissal of public nuisance action); *City of Boston v. Smith & Wesson,* No. 199902590, 2000 WL 1473568 (Mass.Super. July 13, 2000) (allowing public nuisance action to proceed).

Congress can not ignore the fact that under our federal system it is the states that possess primary authority for defining and enforcing tort and criminal law. *See, e.g., Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (internal quotations omitted); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States [are] not to be superseded by ... [a] Federal Act unless that [is] the clear and manifest purpose of Congress.").

Nevertheless, Congress may preempt or regulate particular branches of tort law, particularly as part of a larger regulatory scheme that seeks to redress the injuries previously covered by state law. *Gonzales v. Raich,* —— U.S. ——, ——–——, 125 S.Ct. 2195, 2205–06, 162 L.Ed.2d 1 (2005) ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a

substantial effect on interstate commerce. As we stated in *Wickard,* even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce. We have never required Congress to legislate with scientific exactitude. When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class. In this vein, we have reiterated that when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.") (internal quotations and citations omitted).

As already noted, Congress may, in appropriate circumstances, out of concern for an industry, take steps to limit liability against that industry. The General Aviation Revitalization Act of 1994 ("GARA") is such an example worth considering at length. As a recent article on GARA explains:

GARA created a statute of repose for one segment of the aviation industry and limited perceived negative impacts by providing exceptions to ensure its fairness. The history of GARA's passage and the results to date provide a model for evaluating where reform is appropriate, and for providing reasonable limits to the extent of reform.

. . . .

In the decade and a half leading up to GARA, the general aviation industry saw a marked decline. From 1978 to 1994, annual sales of all general aviation aircraft fell from approximately 18,000 to 928. The piston-engine segment of the industry was hardest hit, experiencing a decline in sales from approximately 14,000 to 555. During the 1980s, as

sales fell, the number of suits against aircraft manufacturers greatly increased. The tens of thousands of aircraft produced since the 1940s represented a "long tail of liability" for the industry. In airplane accidents, the airplane manufacturer was the frequent target of suit, even for planes in service for over twenty years. While sales plummeted, product liability costs increased from twenty-four million dollars in 1978 to more than $200 million in 1992. This factor contributed greatly to the overall decline in the industry during that time frame.

From the 1960s to the mid–1980s, Cessna Aircraft Company was the world's largest piston-powered aircraft manufacturer. Cessna spent twenty to twenty-five million dollars per year on research and development. In 1986, however, Cessna stopped producing general aviation aircraft. For the next eight years, while not producing any piston-engine airplanes, Cessna spent almost twenty-five million dollars per year defending lawsuits, at least one of which involved a forty-seven-year-old airplane.

. . . .

The surge in litigation and the long tail of liability, stretching back to airplanes built prior to the 1940s, made it increasingly difficult for general aviation manufacturers to secure liability insurance for design or product defects. One Lloyds of London underwriter famously said, 'We are quite prepared to insure the risks of aviation, but not the risks of the American legal system.' Thus, the major manufacturers had no alternative but to self-insure. Piper Aircraft was completely self-insured by 1987. Cessna was self-insured for the first fifty million dollars annually and Beech for the first hundred million dollars. The litigation

costs of defending suits involving airplanes manufactured back to the 1940s drove up the price of new airplanes. It is estimated these costs added $70,000 to $100,000 to the cost of a new airplane. In 1994, the Chairman and CEO of Cessna stated "this unlimited exposure to litigation is the sole reason ... that Cessna closed its single engine production lines in 1986, and it's the sole reason those lines are still closed."

The decline of the aviation industry impacted many areas of the economy. Congressional testimony indicated a total of 100,000 jobs were lost in aviation manufacturing, services, and sales. The balance of trade in the industry also dropped significantly. In 1978, the trade surplus was 340 million dollars; in 1981 there was a 200 million dollar deficit; by 1992 the deficit had reached 800 million dollars.

. . . .

In 1993, the National Commission to Ensure a Strong Competitive Airline Industry recommended passage of a statute of repose. With strong congressional support to revive the general aviation industry, particularly its piston-engine segment, President Clinton signed the General Aviation Revitalization Act of 1994. Recognizing the tort system bore some culpability in the general aviation decline, President Clinton stated his belief that GARA would revitalize the industry and create jobs.

James F. Rodriguez, *Tort Reform & GARA: Is Repose Incompatible with Safety?*, 47 Ariz. L.Rev. 577, 577–581 (2005). Congress has also taken strong action, to cite another example, to protect the child vaccine industry against tort liability. *See, e.g.*, National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300–aa10 to 300–aa34; Monograph, Individual Justice in Mass Tort Litigation 123, 169, 304 n. 12 (1995) (discussing protection of the vaccine industry).

More recently, after the September 11 terrorist attacks, Congress passed the Air Transportation Safety and System Stabilization Act of 2001, Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101, 44302–44306), which created a federal strict liability cause of action for all property and personal injury claims resulting from the September 11 terrorist attacks and limited the airlines' liability to the extent of their liability insurance coverage. *See* Kenneth R. Feinberg, Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001 3 (2004) ("The Act's express purpose was to provide financial assistance to an airline industry threatened with collapse as a result of the terrorist attacks and thereby to protect the American economy against the consequences of that collapse."). It also established the 9/11 Victim Compensation Fund, which provided victims of the attack with a remedy. This 9/11 federal regulatory scheme in effect displaced state tort law. *See generally* Kenneth R. Feinberg, What is a Life Worth?: The Unprecedented Effort to Compensate the Victims of 9/11 (2005); Kenneth R. Feinberg, Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001 (2004).

In addition to taking over state substantive law by various devices such as preemption, *see infra* Part IV.D.1., Congress has the power to affect state procedural law. An example can be found in the Class Action Fairness Act of 2005 ("CAFA"), which provided for the removal of state class actions to federal courts where national interests are involved. *See* Class Action Fairness Act of 2005, Pub.L. No. 109–2, 4–5, 119 Stat. 4, 9–13 (codified at 28 U.S.C. § 1453). CAFA was designed to avoid abuses by some state courts af-

fecting industries throughout the United States. *See, e.g.,* George M. Vairo, *Is CAFA Working?,* Nat. L.J., Nov. 14, 2005, at 12 (describing the effects of CAFA).

In the instant case, the legislative history demonstrates a concern on the part of Congress that suits against the gun industry will constitute a kind of end-run around the democratic process, because it is legislatures that should be determining the best means of regulating firearms. *See, e.g.,* 151 Cong. Rec. S. 8908, 8911 (daily ed. July 26, 2005) (Sen.Sessions) ("These lawsuits are part of an anti-gun activist effort to make an end run around the legislative system."). *But see* Patricia Foster, *Good Guns (and Good Business Practices) Provide All the Protection They Need: Why Legislation to Immunize the Gun Industry From Civil Liability is Unconstitutional,* 72 U. Cin. L.Rev. 1739 (2004) ("[T]here has been a massive failure of democracy when it comes to guns. This failure is so great that even the simplest regulations concerning the sale of guns have not been implemented. When democracy so blatantly fails to address public harms as serious as deaths and injuries due to criminals' gun violence, a judicial solution begins to seem more attractive.") (internal quotation omitted). Concerns about the democratic process reflected in the Act must be balanced against traditional state tort and nuisance jurisprudence. Concerns that state tort actions against the Gun Industry will have an adverse effect on nationwide firearm commerce must also be considered. Even though no crippling recoveries have taken place, and no hearings have provided empirical support, considerable weight can be given to congressional findings regarding the possible effect of litigation upon the gun industry. *See* PLCAA § 2(a)(3)2(a)(8) (findings regarding the effect of litigation).

As is outlined below, Congress possesses a strong interest under the Commerce Clause in national and international merchandising of handguns. There is an equally strong interest in the states and their municipalities in protecting local populations against violence, crimes, and public health affects of widespread mortality and morbidity caused by possession of handguns in heavily populated areas. Under our federal system Congress cannot completely deny the states their independent power and responsibility to act reasonably through their civil and criminal courts and other institutions to protect people within their borders. This part of the original pact between states embodied in the constitution has not been obviated by the Civil War, constitutional amendments or changes in our nation's technology, economics or sociology.

The balancing task is a delicate one. The job of balancing belongs to Congress. Congress has constitutionally exercised its power here in adopting the Act.

## C. Commerce Clause

### 1. Dormant Commerce Clause

Existence of Commerce Clause powers in the federal government implies a limit on states' powers affecting interstate commerce—the "Dormant Commerce Clause." The defendants, in their motion to dismiss in *City of New York v. Beretta,* 315 F.Supp.2d 256 (E.D.N.Y.2004), argued that the Commerce Clause prohibited the City's action because "the practical and inevitable effect of the City's suit [would be] to regulate commerce beyond the borders of New York City and State, thus placing an impermissible burden on interstate commerce in violation of the Constitution." *Id.* at 285. The argument compelled a balancing of interests, which the court found then favored the City. Although the City's action could have an affect on the

sale and marketing of firearms outside the borders of New York State, any burden on interstate commerce was found to be "outweighed by the substantial public interest in the regulation of the sale of firearms to protect the health and safety of New York City." *Id.* at 286.

The Court of Appeals for the Second Circuit has recently analyzed the Dormant Commerce Clause's limiting effect on state action that might adversely affect interstate commerce in the context of a challenge to state statutes enacted pursuant to the Master Settlement Agreement between the states and the tobacco industry. *Grand River Enterprises Six Nations, Ltd. v. William Pryor,* 425 F.3d 158 (2d Cir.2005). Although the court of appeals found that the balancing of the interests favored the states, *id.* at 168–69, it concluded that concerns about the extraterritorial effects of the statutes could implicate the Dormant Commerce Clause. *Id.* at 170–73. The court of appeals' holding in *Six Nations* has no effect on any Dormant Commerce Clause decision in the present case. Unlike the substantial effect of the state statutes involved in the cases relied on by the court of appeals in *Six Nations,* the extraterritorial effect of the pending litigation would be minimized by the court because of the limited nature of the City's demand for relief.

The decision in this court that the Commerce Clause did not affect this action was made before passage of the Act. The Dormant Commerce Clause limits state regulatory choices in the absence of congressional action under the Commerce Clause. Here, Congress itself has made the determination that the burden on interstate commerce created by guns litigation is so great as to require the passage of the Act. Dormant Commerce Clause jurisprudence is no longer relevant.

## 2. Legislative History of Act

█ The Commerce Clause concerns driving the legislation were extensively discussed in the Senate. Senator Sessions, in a comprehensive analysis, declared:

> In the past, Congress has found it necessary to protect the light aircraft industry, community health centers, [the] aviation industry, medical implant makers, Amtrak, computer industry members affected by Y2K problems, and good Samaritans.... Congress may enact litigation reforms when lawsuits are affecting interstate commerce, and many of these lawsuits are trying to use State courts to restrict the conduct of the firearms [industry] nationally. They are trying to create legal holdings by the courts that would impact the entire industry nationally. In fact, it is the stated purpose of many of these groups. And a single verdict, even a single verdict ... could bankrupt or in effect regulate an entire segment of our economy and of America's national defense and put it out of business. I do not know when there has been a better example of when this type of legislation was needed.

*See* 151 Cong. Rec. S. 8908, 8912 (daily ed. July 26, 2005) (Sen.Sessions).

Senator Baucus reiterated his colleague's concerns:

> [T]he time, expense, and effort that goes into defending these nuisance suits is a significant drain on the firearms industry, costing jobs and millions of dollars, increasing business operating costs, including sky-rocketing insurance costs, and threatening to put dealers and manufacturers out of business. That is why this bill is so necessary.

151 Cong. Rec. S. 9087, 9107 (daily ed. July 27, 2005) (Sen. Baucus); *see also* 151 Cong. Rec. S. 8908, 8910 (daily ed. July 26, 2005) (Sen. Sessions).

Some senators expressed reservations about exercising Commerce Clause authority to support the Act. For example, Senator Reed stated at length the factual arguments against the need for, or rationality of, the Act:

A part of the rationale for this bill advanced by the proponents is that there is a crisis. There is a crisis with respect to the industry. They are about to lose their ability to manufacture. They are going to go bankrupt. We won't have any weapons for our national security. That is not substantiated by any of the facts before us.

The gun lobby says it needs protection because it is faced with a litigation crisis. The facts tell precisely the opposite story. There is no crisis. There is a crisis in Iraq. There is a crisis in Afghanistan. There is a crisis across the globe with international terrorists. That is a crisis. But it is not a crisis with respect to gun liability in this country. Yet we move from legislation dealing with these huge crises, some of which have existential consequences to us, particularly if terrorists ever get their hands on any type of nuclear material, to a situation where there is no crisis.

. . .

The only two publicly held gun companies that have filed recent statements at the Securities and Exchange Commission contradict the claim that they are threatened by lawsuits. Smith & Wesson filed a statement with the SEC on June 29, 2005, stating that:

We expect net product sales in fiscal 2005 to be approximately $124 million, a 5% increase over the $117.9 million reported for fiscal 2004. Firearms sales for fiscal 2005 are expected to increase by approximately 11% over fiscal 2004 levels.

That is their SEC report which they have to file subject to severe penalties for misstatement and mistruth. I believe that. It appears to be a banner year for Smith & Wesson. There is no crisis.

They go on and say in another filing on March 10, 2005:

In the nine months ended January 31, 2005, we incurred $4,535 in defense costs, net of amounts received from insurance carriers, relative to product liability and municipal litigation.

What they said is—this company, with a banner year of increased sales, with projections for better sales—they incurred $4,535 in out-of-pocket costs to defend product liability and municipal litigation claims and suits. That is a crisis? Sales are up. Litigation costs in this particular area—out-of-pocket costs, to be accurate, of $4,500. That is what they are telling the Federal regulators, under severe penalties for misstatements and even inaccurate statements. There is no crisis.

In that same period for which they incurred $4,535 in out-of-pocket costs, Smith & Wesson spent over $4.1 million in advertising . . . .

Meanwhile, gun manufacturer Sturm, Ruger told the SEC in a March 11, 2005 filing:

It is not probable and is unlikely that litigation, including punitive damage claims, will have a material adverse effect on the financial position of the Company. Essentially, what these two publicly reporting companies have said, despite all of the discussion by others that they are on the verge of bankruptcy, is: There is no material adverse effect on our financials based on this type of litigation. There is no crisis.

So at the same time the gun makers are reporting to the SEC that litigation costs are not likely to have a material adverse effect on the businesses, their trade associations have been rapidly inflating the unsubstantiated estimates of litigation costs. Gun lobby claims of alleged litigation costs have risen in $25 million increments, with no data of any kind to support these claims because most of these companies in the industry are privately held. But I would suggest if the publicly held companies are offering their truthful admissions to the SEC—unless the privately held companies are woefully unmanaged or are unusually involved in this type of litigation—then these estimates have to be widely suspect.

. . . .

[The number] of lawsuits faced by the gun industry is, if anything, far less than many other industries. From 1993 to 2003, 57 suits were filed against gun industry defendants, out of an estimated 10 million tort suits, according to the State Court Journal published by the National Center for State Courts—57 out of 10 million. That is not a record of litigants out of control.

The actual monetary awards faced by the gun lobby are even less. . . .

In any case, the purpose of lawsuits filed on behalf of victims is not to bankrupt the industry. In fact, some of the cases filed have sought only injunctive relief, including reforms of industry trade practices that would make the public safer. This is not always about money. In some cases it is about safety for the general public. . . .

Even when plaintiffs seek common-sense reforms in the industry that could save lives, rather than have money damages, the gun lobby and its allies in Congress seek to shut the courthouse door in the face of these victims.

*Id.* at S. 8913–14 (Sen. Reed).

None of this discussion on need for the Act in Congress is decisive on constitutionality. There was factual support for the view of both proponents and opponents of the Act. Elected national legislature members can be deemed to know the needs of their own constituencies. Ultimately, the vote of Congress in favor of the Act can be assumed—for present purposes—to demonstrate that a majority found that the factual concerns of those favoring the Act were well founded and outweighed the evidence supplied by opponents.

### 3. Recent Commerce Clause Cases

The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. As the Supreme Court recently declared in analyzing the Commerce Clause:

We start with first principles. The Constitution creates a Federal Government of enumerated powers. As James Madison wrote, "the powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."

*United States v. Lopez,* 514 U.S. 549, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (internal citations omitted).

In *Lopez,* the Court held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone, exceeded Congress' authority under the Commerce Clause. The Court outlined the history of its Commerce Clause jurisprudence, *see Lopez,* 514 U.S. at 552–59, 115 S.Ct. 1624, underscoring the waxing and waning of Congress's regulatory power under changing interpretations. *Compare United States v. E.C. Knight Co.,* 156 U.S. 1, 12, 15 S.Ct. 249, 39 L.Ed. 325 (1895) (holding that Congress could not regulate activities such as "production" and "manufacturing" because "[c]ommerce succeeds to manufacture, and is not part of it.") *with Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ("even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect' ").

The *Lopez* Court recognized three broad categories of activity that Congress may regulate under its commerce power:

First, Congress may regulate the use, of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce.

Within this final category, admittedly, our case law has not been clear whether an activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

*Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624 (internal citations and quotations omitted).

First, the *Lopez* Court concluded that the Gun–Free School Zones Act of 1990 was a criminal statute that by its terms had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561, 115 S.Ct. 1624. Although the argument could be made that the statute in question was a part of the larger regulatory scheme controlling gun distribution, the Court reasoned that the statute was not an *essential* part of such a comprehensive regulatory scheme, which could be undercut unless the intrastate activity, in this case the possession of firearms, were regulated. *Id.*

A second aspect of the Court's analysis turned on the absence of a jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question would affect interstate commerce. *Id.* at 561–62, 115 S.Ct. 1624.

A third component of the Court's approach involved considering the absence of congressional findings demonstrating the effects upon interstate commerce of gun possession in a school zone. *Lopez,* 514 U.S. at 563, 115 S.Ct. 1624 ("[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substan-

tially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here."). The Government had argued that Congress did not need to make explicit findings because it had "accumulated institutional expertise regarding the regulation of firearms through previous enactments." *Id.* The Court rejected the Government's argument:

[I]mportation of previous findings to justify § 922(q) is especially inappropriate here because the prior federal enactments [do not] speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows through new ground and represents a sharp break with the longstanding pattern of federal firearms legislation.

*Id.* (internal quotation omitted).

The fourth and final step of the Court's analysis, and possibly its most significant in the present context, involved the Government's contention that the statute was a valid exercise of Commerce Clause authority because possession of a firearm in a local school zone substantially affects interstate commerce:

The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanisms of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped

educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce.

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

*Id.* at 563–64, 115 S.Ct. 1624. The Court concluded that to uphold the Government's contentions, "we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567, 115 S.Ct. 1624.

In *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), a former college student brought claims under the Violence Against Women Act ("VAWA") against students who alleg-

edly raped her. The Court held that the Commerce Clause did not provide Congress with the authority to enact the civil remedy provision of VAWA, inasmuch as the provision was not a regulation of economic activity that substantially affected interstate commerce.

The *Morrison* Court analyzed the factors it relied on in *Lopez*—the nature of the activity regulated, the presence or absence of an express jurisdictional element, the presence or absence of congressional findings, and the link between the activity regulated and interstate commerce, *Morrison*, 529 U.S. at 611–12, 120 S.Ct. 1740—before coming to its ultimate conclusion about congressional power:

> With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is *economic in nature*.

*Id.* at 613, 120 S.Ct. 1740 (emphasis added).

It is worth noting the differences between *Morrison* and *Lopez*. Most significantly, *Morrison* came before the Court with substantial legislative findings regarding the serious impact that gender-motivated violence has on victims and their families. *Id.* at 614, 120 S.Ct. 1740. The Court dismissed these findings of Congress, concluding that whether "particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legisla-

tive question...." *Id.* (internal quotation omitted). The Court reiterated select language from *Lopez*: "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* at 614, 120 S.Ct. 1740.

In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce

> by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

Given these findings and petitioner's arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded.

*Id.* at 615, 120 S.Ct. 1740.

In *Gonzales v. Raich*, —— U.S. ——, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005), users and growers of marijuana for medical purposes under California's Compassionate Use Act sought a declaration that the Controlled Substances Act ("CSA") was unconstitutional as applied to them. The Court held that the application of CSA provisions criminalizing manufacture, distribution, or possession of marijuana to intrastate growers and users of marijuana for medical purposes did not violate the Commerce Clause. The Court prefaced its holding

with the following cautionary instruction: "In assessing the validity of congressional regulation, none of our Commerce Clause cases can be viewed in isolation. As charted in considerable detail in *United States v. Lopez,* our understanding of the reach of the Commerce Clause, as well as Congress' assertion of authority thereunder, has evolved over time." *Id.* at 2205.

The Court explained that its decision in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), was of particular relevance. *Gonzales,* 125 S.Ct. at 2206. *Wickard,* the Court noted, "establishes that Congress can regulate purely intrastate activity that is not in itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* In *Gonzales,* the Court reasoned that Congress had a reason for believing that, when viewed in the aggregate, leaving home-consumed marijuana outside federal control would affect price and market conditions in the interstate market of illegal substances. *Id.* at 2207. ("While the diversion of homegrown wheat tended to frustrate the federal interest in stabilizing prices by regulating the volume of commercial transactions in the interstate market, the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety. In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.").

Recent Commerce Clause cases such as *Lopez* and *Morrison* require the courts to give sensitive consideration to state policies and practice as well as to the need of Congress to control interstate commerce. They do not, however, support a ruling of unconstitutionality of the Act.

The statute in *Lopez* "did not regulate any economic activity and did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity." *Id.* at 2209. Here, Congress expressly found that the possibility that members of the national Gun Industry would be held liable in legal actions of the type foreclosed by the Act "constitutes an unreasonable burden on interstate and foreign commerce of the United States." PLCAA § 2(a)(6). Furthermore, the connection between the regulated activity and interstate commerce under the Act is far more direct than that in *Morrison.* The City itself makes frequent reference to the predominately interstate and foreign nature of the gun trade it seeks to control. *See, e.g.,* Compl. ¶¶ 15–55 (none of the defendants are organized under the laws of the State of New York or have their principal place of business in the State of New York), ¶ 69 (allegation that firearms seized and investigated in connection with a firearms trafficking investigation "almost invariably ... came from out of state").

Although a court may have reservations about the likelihood of the predicted catastrophic collapse of the Gun Industry, there is a rational basis for Congress' determination that the Act was necessary to protect that industry. *See Gonzales,* 125 S.Ct. at 2208 ("In assessing the scope of Congress' authority under the Commerce Clause ..., [the court] need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."). Successful lawsuits against the Gun Industry would arguably affect the manner in which national and international manufac-

turers and wholesalers of handguns do business.

### D. General Congressional Powers

#### 1. Preemption

 The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2. Congress has wide powers to displace state lawmaking power in any area in which it has regulatory authority. Preemption may be complete or partial, express or implied. "In theory, this broad proscription would allow courts to strike down vast numbers of state laws." Betsey Grey, *The New Federalism Jurisprudence and National Tort Reform,* 59 Wash. & Lee L.Rev. 475, 504 (2002). In order for a federal action to have preemptive effect, it must first be a valid exercise of federal power. *See* Erwin Chemerinsky, Constitutional Law 303 (2001).

 In a series of recent decisions beginning with cases involving the federal regulation of cigarette warnings, the Supreme Court has examined preemption of various common law tort claims. The discussion in these cases has turned in large part on a presumption against preemption of common law remedies for compensating tort victims—an area traditionally within the states' domain. *See Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001); *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). While Congress may preempt or regulate particular branches of tort law, particularly as part of a larger regulatory scheme that seeks to redress the injuries previously covered by state law, the Court has made clear the importance of respecting the role of the states as "independent sovereigns." *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240. In this vein, the Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action," particularly when Congress has legislated in a field "traditionally occupied" by the states. *Id.* at 485, 116 S.Ct. 2240. State laws "are not to be preempted by a federal statute unless it is the clear and manifest purpose of Congress to do so," *Geier,* 529 U.S. at 894, 120 S.Ct. 1913, and federal statutes that do preempt may be interpreted narrowly. *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240; *Cipollone,* 505 U.S. at 518, 112 S.Ct. 2608.

Preemption law does not control the instant case. By means of the Act, Congress has attempted to preclude some—although not all—state gun legislation. It has not provided new federal tort protections that might be considered to preempt, nor has it improperly "alter[ed] or negat[ed]" those aspects of state law that it deemed problematic and incorrect," as plaintiff contends. Pl.'s Second Mem. in Opp. 44.

The City's discussion of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) is irrelevant. *See* Pl.'s Second Mem. in Opp. 41–45. An *Erie* analysis is not applicable. Congress had the authority to pass the Act under its Commerce Clause powers, and where the Act is operative in a diversity case the Act will be applied. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 27, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) ("a district court sitting in diversity must apply a federal statute that controls the issue before the court and that represents a valid exercise of Congress' constitutional powers"). Where state law is operative in a diversity case it will continue to be applied as *Erie*

requires. *Erie* overruled *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), which applied federal common law in diversity cases; it did not purport to control the application of federal statutes in such cases.

### 2. Deprivation of Existing Rights; Ex Post Facto

■ No claim for damages is sought. *See* Compl. 26–29 (requesting injunctive relief). Thus, elimination of a vested cause of action or property right is not a basis for a constitutional challenge. *See, e.g., Miller v. French,* 530 U.S. 327, 347, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (injunctive relief is "subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law"); *Benjamin v. Jacobson,* 172 F.3d 144, 164 (2d Cir.1999) (en banc) (there can be no vested right to injunctive relief, even after injunction entered).

■ It could be argued that the plaintiff has a vested interest in the costs and disbursements it would be entitled to for earlier phases of this litigation and that depriving it of these monetary rights constitutes an *ex-post facto* denial of prior-vested rights. *See* Fed.R.Civ.P. 54 (costs "shall be allowed as of course to the prevailing party"). In light of the serious federalism and other claims at issue this possible *de minimis* claim does not warrant a declaration of unconstitutionality.

### 3. Retroactivity

■ "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than the Republic." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). "[T]he presumption is very strong that a statute was not meant to act retro-

spectively, and it ought never to receive such a construction if it is susceptible of any other." *Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics,* 665 F.Supp. 323, 336 (S.D.N.Y.1987) (internal citation omitted). The antiretroactivity principle was of such concern to the founders that it was safeguarded in various provisions of the Constitution, including the *Ex Post Facto* Clause, the Fifth Amendment's Takings Clause, prohibitions on Bills of Attainder, and the Due Process Clause's protection of the interests in fair notice and repose:

> These provisions demonstrate that retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.... [It] restricts governmental power by restraining arbitrary and potentially vindictive legislation.

*Landgraf,* 511 U.S. at 266–67, 114 S.Ct. 1483 (internal quotation and citations omitted).

■ A statute does not operate retrospectively simply because it is applied in a case arising from conduct antedating the statute's enactment. Courts instead ask whether the new provision attaches new legal consequences to events completed before its enactment:

> The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgement concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely

to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance. *Id.* at 270, 114 S.Ct. 1483 (internal quotations omitted).

Once it is established that a provision attaches new legal consequences to events that took place before its enactment, the task is to determine whether Congress has expressly prescribed the statute's proper reach. *See id.* at 280, 114 S.Ct. 1483. If Congress has done so, there is no need to resort to judicial default rules. Where the statute in question unambiguously applies to preenactment conduct, there is no conflict between the antiretroactivity presumption and the principle that a court should apply the law in effect at the time of decision. *See id.* Where the new statute would have a genuinely retroactive effect, *i.e.,* where it would impair rights a party possessed when he or she acted, increase liability for past conduct, or impose new duties with respect to transactions already completed, the traditional analysis teaches that the statute does not govern absent clear congressional intent favoring such a result. *See id.*

Here the Act is not being applied retroactively to prior conduct. Because the City has requested only injunctive relief, the case is one to prohibit future conduct only. Furthermore, Congress has made it clear that the Act was intended to apply retroactively. *See* PLCAA § 3(b) (requiring dismissal of pending qualified civil liability actions). Retroactivity is not an issue.

### 4. Effect on Pending Cases

The fact that the Act affects a pending case is not a conclusive reason for denying its effect. *See Ex Parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869) (ruling on a habeas corpus case which had already been argued and submitted when Congress eliminated the jurisdiction it had previously granted). Unlike *McCardle,* this court in the instant case is exercising general diversity jurisdiction rather than a specified congressional grant of habeas corpus jurisdiction. But this factor should have no bearing on congressional power in a case with no grave constitutional jurisdictional overtones.

In *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), the Supreme Court established an important Article III limitation on Congress' lawmaking power that plaintiff contends is squarely implicated in this case. The Court held that Congress cannot through legislation direct the outcome of a pending case without changing the substantive law underlying the suit—for to do so would infringe the judiciary's role in deciding cases and would violate the separation of powers guaranteed by the Constitution. *Id.* at 145–47.

*Klein* involved a suit brought by the administrator of the estate of a confederate sympathizer whose property had been sold by federal agents during the Civil War. The administrator sought to recover the proceeds of the sale under a federal law allowing noncombatant confederate landowners to sue for such a recovery upon proof of loyalty to the Union, which the Supreme Court had held in a prior case could be established by evidence of a presidential pardon. Because the administrator's decedent had received such a pardon, the court of claims ruled in his favor. While that decision was pending on appeal, Congress passed a law providing that a pardon did not in fact constitute proof of loyalty, but rather served as conclusive

proof of *dis*loyalty in most circumstances. The law further directed the Supreme Court to dismiss for lack of jurisdiction any suit in which the claimant had established loyalty on the basis of a pardon. *Id.* at 146.

Rather than decline jurisdiction in accord with these provisions, the Supreme Court invalidated the law on the ground that it intruded on the Article III authority reserved to the federal courts. The Court began by acknowledging Congress' "complete control" over federal jurisdiction. If the law at issue "simply denied the right of appeal in a particular class of cases," the Court reasoned, "there could be no doubt that it must be regarded as an exercise of the power of Congress to make 'such exceptions from the appellate jurisdiction' as should seem to it expedient." *Klein,* 80 U.S. (13 Wall.) at 145. But this law could not be regarded as a proper exercise of that power, the Court concluded, because it took the form of a congressional command to the federal courts to reach a particular outcome in a defined set of cases—an attempt, in the court's words, to "prescribe rules of decision to the Judicial Department of the government in cases pending before it." *Id.* at 146. That is to say, Congress had not simply deprived courts of jurisdiction to entertain a certain type of claim; it had mandated that a pending case be rejected and dismissed based upon proof of specified evidence that Congress had deemed untenable. *Id.* at 147. According to the Court, Congress could not thus "prescribe a rule for the decision of a cause in a particular way" without "pass[ing] the limit which separates the legislative from the judicial power." *Id.* at 146–147.

In reaching this conclusion, the Court distinguished another case, *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), which addressed the validity of a separate attempt by Congress to influence the outcome of a pending federal case. In *Wheeling,* the Court reasoned, Congress had simply changed the underlying law: "[n]o arbitrary rule of decision was prescribed," but instead "the court was left to apply its ordinary rules to the new·circumstances created by the act." *Klein,* 80 U.S. (13 Wall.) at 146–147. In *Klein,* by contrast, no new circumstances had been created by legislation: Congress simply directed the Court to reach a particular outcome.

*Klein* thus stands, plaintiff argues, for "the principle that Congress cannot direct the outcome of a pending case without changing the law applicable to that case." *Paramount Health Sys., Inc. v. Wright,* 138 F.3d 706, 710 (7th Cir.1998). Although Congress may "enac[t] new standards" and leave "to the courts the judicial functions of applying those standards," *Nichols v. Hopper,* 173 F.3d 820, 823 (11th Cir.1999), it may not otherwise "adjudicat[e] particular cases legislatively." *Ruiz v. U.S.,* 243 F.3d 941, 948 (5th Cir.2001); *see also Schiavo ex rel. Schindler v. Schiavo,* 404 F.3d 1270, 1274 (11th Cir.2005) (en banc) (Birch J., specially concurring) ("By denying federal courts the ability to exercise abstention or inquire as to exhaustion or waiver under State law, the Act robs federal courts of judicial doctrines long-established for the conduct of prudential decisionmaking."); *Imprisoned Citizens Union v. Ridge,* 169 F.3d 178, 187 (3d Cir. 1999); *Hadix v. Johnson,* 144 F.3d 925, 939–40 (6th Cir.1998) ("Although Congress remains free to amend governing law and thereby affect the outcome of pending cases, the Legislature may not impose a rule of decision for pending judicial cases without changing the applicable law.") (internal citation omitted); *Mount Graham Coalition v. Thomas,* 89 F.3d 554, 557–58 (9th Cir.1996) (remarking that *Klein* "prohibits Congress from directing a particular

decision in a case without repealing or amending the law underlying the decision"). Where Congress has not "amend[ed] applicable law," "set[ting] out substantive legal standards for the Judiciary to apply," *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), it may not "control the ... ultimate decision" in a case and leave the court "no adjudicatory function to perform." *United States v. Sioux Nation of Indians,* 448 U.S. 371, 392, 405, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *see also Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 436, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) (assuming that *Klein* forbids Congress from "directing ... a particular decision in a case, without repealing or amending the law underlying the litigation") (internal quotation omitted).

The Supreme Court reaffirmed the continuing validity of this *Klein* principle in *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). The *Plaut* Court struck down a section of the Securities Exchange Act of 1934 to the extent that it required federal courts to reopen private civil actions that had been brought under the Act. The provision was unconstitutional because it "offend[ed] a postulate of Article III ... deeply rooted in our law," which is that it is the province and duty of the judicial department to say what the law is. *Id.* at 218, 115 S.Ct. 1447 (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)). Specifically, the Court held that "Congress has exceeded its authority by requiring the federal courts to exercise the judicial power of the United States in a manner repugnant to the text, structure, and traditions of Article III." *Id.* at 217–218, 115 S.Ct. 1447. "The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them." *Id.* at 218–19, 115 S.Ct. 1447.

The *Plaut* Court explained: "The Framers of our Constitution lived among the ruins of a system of intermingled legislative and judicial powers," and this "sense of a sharp necessity to separate the legislative from the judicial power, prompted by the crescendo of legislative interference with private judgments of the courts, triumphed among the Framers of the new Federal Constitution." *Plaut,* 514 U.S. at 219–21, 115 S.Ct. 1447. The Court quoted "the great constitutional scholar" Thomas Cooley's articulation of the core separation of powers principle involved:

If the legislature cannot thus indirectly control the action of the courts by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, *or directing what particular steps shall be taken in the progress of a judicial inquiry.*

*Id.* at 225, 115 S.Ct. 1447 (emphasis added) (quoting Thomas Cooley, Constitutional Limitations 94–95 (1868)).

The Act's "immediate dismissal" provision presents, in a plaintiff's view, "a plain and straightforward violation of the *Klein* rule." Pl.'s Second Mem. in Opp. 29. That provision directs federal courts to dismiss—and thus resolve in the defendant's favor—any "qualified civil liability action" pending on the date the Act is passed. Fed.R.Civ.P. 41(b) (stating that a dismissal generally "operates as an adjudication on the merits"). According to plaintiff, it thus leaves the federal courts "no adjudicatory function to perform," directing the "ultimate decision" in pending cases. Pl.'s Second Mem. in Opp. 30.

Plaintiff's *Klein* argument is unpersuasive. The Act imposes a "new legal standard" that is not restricted to pending cases. *Miller v. French,* 530 U.S. 327, 349, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000). The new legal standard bars "qualified civil liability actions," as defined in section 4(5). For cases commenced after the effective date of the Act, section 3(a) states that "[a] qualified civil liability action may not be brought in any Federal or State court." Section 3(b) applies the new standard to pending actions by providing that "[a] qualified civil liability action that is pending on the date of the enactment of the Act shall be immediately dismissed by the court in which the action was brought or is currently pending." Moreover, unlike the provision at issue in *Klein,* the Act does not "directly interfere with judicial fact finding." *Axel Johnson, Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 82 (2d Cir.1993). For example, the statute does not control courts' determinations with respect to whether particular cases satisfy the requisites set forth in section 4(5)(A)(i)-(vi) for avoiding application of the Act. Rather, section 4(5) leaves to the courts "the task of determining whether a claim falls within the ambit of the statute." *Id.*

### E. First Amendment

█ The First Amendment provides: "Congress shall make no law respecting . . . the right of the people . . . to petition the Government for a redress of grievances." There appears to be no merit to plaintiff's claim that the Act deprives it of the right to petition by cutting off its access to the courts. *See* Pl.'s Second Mem. in Opp. 31–37. The City has full rights to petition Congress, to pass restrictive gun laws, and to work with other cities and states to elect Congressional representatives that will change the Act. The Act does not inhibit a constitutional right of petition.

### F. Second Amendment

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."

█ Nothing in the Second Amendment or any other constitutional provision suggests that state or municipal attempts to control gun violence are restricted by the Second Amendment. *See, e.g., Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886) (the Second Amendment applies only to the federal government); *Bach v. Pataki,* 408 F.3d 75, 84 (2d Cir. 2005) ("we hold that the Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts"); H. Richard Uviller & William G. Merkel, The Militia and the Right to Arms, or How the Second Amendment Fell Silent 15–16 (2002); Laurence H. Tribe, American Constitutional Law 299 n. 6 (2d ed.1988).

### G. Tenth and Eleventh Amendments

The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or citizens or subjects of any Foreign State."

█ Recent Supreme Court decisions under the Tenth and Eleventh Amendments reflect the Court's desire to respect the states as sovereign entities within the federal system. The Court's recent decisions under the Tenth Amend-

ment reflect a shift toward increased protection of state sovereignty through restrictions on congressional "commandeering" of state governments. *See New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). Likewise, the Supreme Court has recently utilized the Eleventh Amendment to shift power of regulation from the federal government to the states. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *But see Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (upholding the Family and Medical Leave Act against an Eleventh Amendment challenge). These cases are relevant to the present discussion because they are suggestive of the importance of state rather than national government control. *See* Stephen Breyer, Active Liberty: Interpreting Our Democratic Constitution 59–63 (2005) (describing the Court's recent federalism decisions under the Tenth and Eleventh Amendments as limiting the power of the federal government over the states). They are not, however, applicable to the present case, and do not determine the constitutionality of the Act. Congress is not commandeering the states by means of the Act, and the Act does not implicate any state's immunity from suit.

## H. Fourteenth and Fifth Amendments

### 1. Due Process and Equal Protection

The Fourteenth Amendment reads in part: "No State shall ... deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The equivalent provision in the Fifth Amendment is: "No person shall be ... deprived [by the federal government] of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

█ Contrary to the City's assertion, there is no denial of due process in the Act as applied to its case. Pl.'s Second Mem. in Opp. 37–40, 45–49. The argument of the City is based on the assumption that it possesses "a substantial, protectable interest in its tort claim." *Id.* at 39. Since the claim is prospective only, due process has not been denied. There is, in any event, no vested interest in injunctive relief. *See, e.g., Miller v. French*, 530 U.S. 327, 347, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (injunctive relief is "subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law"); *Benjamin v. Jacobson*, 172 F.3d 144, 164 (2d Cir.1999) (en banc) (there can be no vested right to injunctive relief, even after injunction entered).

█ Plaintiff's equal protection argument is also unavailing. *See* Pl.'s Second Mem. In Opp. 49–58. There is a rational basis for the distinctions the Act makes. Because the Act does not implicate the City's First Amendment right to petition, *see supra* Part IV.E, or any other Constitutional right, the classification in the Act does not burden a fundamental right, and the Act is therefore subject to rational basis review. *See, e.g., Burlington N. R. Co. v. Ford*, 504 U.S. 648, 651, 112 S.Ct. 2184, 119 L.Ed.2d 432 (1992); *United*

*States v. Sperry Corp.*, 493 U.S. 52, 65, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989); *Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). There is a rational basis for the distinctions the Act draws. Congress indicated that it thought that nationwide commerce in firearms was particularly imperiled by the threat of qualified civil liability actions. "Rational basis review does not allow courts to judge the wisdom or desirability of legislative policy determinations," so long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

In view of the lack of valid due process and equal protection claims by the plaintiff, it is not necessary to consider whether the City is a person with standing to raise the issue under the Fifth or Fourteenth Amendments. *See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (no state standing under Fifth Amendment); *City of Sault Ste. Marie v. Andrus*, 532 F.Supp. 157, 167–68 (D.D.C.1980) (no municipal standing under Fifth Amendment).

### 2. Section 5

Congress has indicated that one of the purposes of the Protection of Lawful Commerce in Arms Act is "[t]o guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution." *See* PLCAA § 2(b)(3). Section 5 of the Fourteenth Amendment states that Congress may enforce "by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law,' nor deny any person 'equal protection of the laws.'" *City of Boerne v. Flores*, 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

In *City of Boerne v. Flores*, the Court struck down the Religious Freedom Restoration Act of 1993 as exceeding Congress' section 5 enforcement powers. The Court held:

> There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing that distinction, one apparent from the text of the Amendment.

*Id.* at 520, 117 S.Ct. 2157. The Court expressed special concern about preventive measures. *Id.* at 530, 117 S.Ct. 2157 ("While preventive rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved. The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.") (internal citation omitted). In *Boerne*, the Court focused on the legislative record. *Id.* ("RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry."). It concluded, however, that "[t]his lack of support in the legislative record ... [was] not RFRA's most serious shortcoming," but instead that "RFRA [was] so out of proportion to a supposed remedial or preventive object that it [could] not be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 531–32, 117 S.Ct. 2157.

When subsequently considering whether states could be sued by their employees under the federal law against age discrimination, the Court held that Congress exceeded its Fourteenth Amendment remedial powers by abrogating the states'

immunity from suits brought under the Age Discrimination in Employment Act (ADEA). *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (concluding that ADEA's purported abrogation of States' sovereign immunity was invalid under Fourteenth Amendment). Even though Congress was clear in expressing its intent to abolish the states' Eleventh Amendment immunity from suit, that abrogation was found to be both disproportionate to any unconstitutional conduct of the states and unsupported by adequate congressional findings of age discrimination by the states so as to exceed Congress' authority under Section 5 of the Fourteenth Amendment to enact "appropriate legislation" to enforce the Equal Protection Clause. *Kimel*, 528 U.S. at 89, 91, 120 S.Ct. 631 ("Our examination of the ADEA's legislative record confirms that Congress' 1974 extension of the Act to the States was an unwarranted response to a perhaps inconsequential problem. Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation. The evidence compiled by petitioners to demonstrate such attention by Congress to age discrimination by the States falls well short of the mark. That evidence consists almost entirely of isolated sentences clipped from floor debates and legislative reports.... Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field.").

In *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Court again held that Congress exceeded its Fourteenth Amendment powers to abrogate state sovereign immunity when it enacted Title I of the Americans with Disabilities Act of 1990(ADA). The Court found that Congress had failed to establish an appropriate exercise of its authority in the language of the ADA. Moreover, the majority found the record compiled by Congress troublesome: it determined that the ADA's legislative record was insufficient to show a history and pattern of irrational employment discrimination by the states against the disabled. Even if Congress had established a sufficient record, proportionality concerned the Court. It found that the rights and remedies created by the ADA against the states were not congruent and proportional to the targeted violation. *See Garrett*, 531 U.S. at 373–74, 121 S.Ct. 955 ("In [the Voting Rights Act], Congress documented a marked pattern of unconstitutional action by the States.... The contrast between this kind of evidence, and the evidence that Congress considered in the present case, is stark. Congressional enactment of the ADA represents its judgment that there should be a 'comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. Those requirements are not met here....").

*Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) held that Title II of the ADA, as applied to cases implicating the fundamental right of access to the courts, constituted a valid exercise of Congress' enforcement power under the Fourteenth Amendment. Sig-

nificant for purposes of the instant motion, the Court again placed great emphasis on legislative history. *See Lane,* 541 U.S. at 516, 524, 124 S.Ct. 1978 ("The ADA was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities. In the years immediately preceding the ADA's enactment, Congress held 13 hearings and created a special task force that gathered evidence from every State in the Union.... Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights.").

■ These recent cases suggest that the indirect reference to Section 5 of the Fourteenth Amendment in the Act will not save it if is otherwise unconstitutional. *See* PLCAA § 2(a)(7). There is no history or pattern of constitutional violations to remedy, and a blanket statement of Congress' intent to regulate under Section 5 does not suffice for it to exercise that power. But, since the Act is not unconstitutional, the alleged flimsiness of the reference in the Act's findings to the Fourteenth Amendment furnishes no support for plaintiff's position. *See* Pl.'s Second Mem. in Opp. 57–59.

## I. Conclusion as to Constitutionality

As construed, the Act adequately balances Congressional concern over the viability of the handgun industry and the concern of the states and municipalities for the safety of their populations against handgun violence spawned by careless merchandising. The Act would not be unconstitutional if it required dismissal of the case at bar.

## V. Stays

■ When Congress believes litigation stays are required, it provides for them. In two other recent statutes, the Prison Litigation Reform Act, 18 U.S.C. § 3626(e)(2)(A)(i), and the Private Securities Litigation Reform Act, 15 U.S.C. § 77z–1(b), Congress specifically provided for the immediate stay of proceedings once a defendant files a motion to dismiss. Its silence on this issue in the Act is significant.

Defendants' argument that a stay pending an immediate appeal of an adverse decision is required by the Act rests inappositely, on *Harlow v. Fitzgerald* and its progeny, which consider whether absolute or qualified immunity for *government officials* should be resolved in advance of trial. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (aides and advisers of President); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (Attorney General); *Palmer v. Richards,* 364 F.3d 60 (2d Cir. 2004) (corrections officer); *Locurto v. Safir,* 264 F.3d 154 (2d Cir.2001) (police department); *McCullough v. Wyandanch Union Free Sch. Dist.,* 132 F.Supp.2d 87 (E.D.N.Y.2001) (school district and board of education); *Sorenson v. City of New York,* No. 98 Civ. 3356, 2000 WL 1808560 (S.D.N.Y. Dec.11, 2000) (City of New York); *Atkinson v. Goord,* No. 01 Civ. 0761, 2002 WL 31095167 (S.D.N.Y. Sept. 19, 2002) (granting stay of document production and deposition questions only for State Department of Correctional Services).

The courts' concerns in these cases were with "subjecting *officials* to the risks of trial"—risks which are peculiar to the government and public officials, such as "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from

public service." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806 (emphasis added). The courts were concerned about burdening the government while immunity was considered. Defendants are not government officials, and they cite no authority for the proposition that private parties should receive the same immunity benefits as government officials. Their claim that the purpose of the Act was to spare them litigation expenses in the case at hand only assumes what it seeks to prove. *See* Letter dated October 27, 2005 from Lawrence Greenwald, Esq. to the court. Even if Congress wished to help private defendants avoid the expense of defending a qualified civil liability action, there must necessarily be a preceding determination that the action in question is of the kind to be protected against. The Act does not protect defendants from actions that *might turn out to be* qualified civil liability actions.

Nevertheless, since the Act is said by defendants to affect suits pending across the nation and its interpretation is an issue of first impression, raising possible constitutional questions, a temporary discretionary stay is granted. It will provide time for immediate appellate review.

### VI. Conclusion; Certification of Interlocutory Appeal; Stay

The Protection of Lawful Commerce in Arms Act does not require dismissal of this action. The motion to dismiss is denied.

This case involves an interlocutory order not otherwise appealable. There is a substantial ground for disagreement about a controlling issue of law—the applicability of the Act to the present litigation—and an immediate appeal may substantially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

A stay of all proceedings is granted pending completion of appellate review.

SO ORDERED.

### APPENDIX

109 P.L. 92,*; 119 Stat. 2095;

2005 Enacted S. 397; 109 Enacted S. 397

### UNITED STATES PUBLIC LAWS

109th Congress—1st Session

An Act

To prohibit civil liability actions from being brought or continued against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of their products by others.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the 'Protection of Lawful Commerce in Arms Act'.

SEC. 2. FINDINGS; PURPOSES.

(a) Findings—Congress finds the following:

(1) The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.

(2) The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.

(3) Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm

caused by the misuse of firearms by third parties, including criminals.

(4) The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.

(5) Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

(6) The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

(7) The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

(8) The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

(b) Purposes—The purposes of this Act are as follows:

(1) To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

(2) To preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

(3) To guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution, pursuant to section 5 of that Amendment.

(4) To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

(5) To protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances.

(6) To preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States.

(7) To exercise congressional power under article IV, section 1 (the Full Faith and Credit Clause) of the United States Constitution.

SEC. 3. PROHIBITION ON BRINGING OF QUALIFIED CIVIL LIABILITY ACTIONS IN FEDERAL OR STATE COURT.

(a) In General—A qualified civil liability action may not be brought in any Federal or State court.

(b) Dismissal of Pending Actions—A qualified civil liability action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending.

SEC. 4. DEFINITIONS.

In this Act:

(1) ENGAGED IN THE BUSINESS—The term 'engaged in the business' has the meaning given that term in section 921(a)(21) of title 18, United States Code, and, as applied to a seller of ammunition, means a person who devotes time, attention, and labor to the sale of ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of ammunition.

(2) MANUFACTURER—The term 'manufacturer' means, with respect to a qualified product, a person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under chapter 44 of title 18, United States Code.

(3) PERSON—The term 'person' means any individual, corporation, company, association, firm, partnership, society, joint stock company, or any other entity, including any governmental entity.

(4) QUALIFIED PRODUCT—The term 'qualified product' means a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18, United States Code), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce.

(5) QUALIFIED CIVIL LIABILITY ACTION—

(A) IN GENERAL—The term 'qualified civil liability action' means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include—

(i) an action brought against a transferor convicted under section 924(h) of title 18, United States Code, or a comparable or identical State felony law, by a party di-

rectly harmed by the conduct of which the transferee is so convicted;

(ii) an action brought against a seller for negligent entrustment or negligence per se;

(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code;

(iv) an action for breach of contract or warranty in connection with the purchase of the product;

(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

(vi) an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 or chapter 53 of title 26, United States Code.

(B) NEGLIGENT ENTRUSTMENT— As used in subparagraph (A)(ii), the term 'negligent entrustment' means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

(C) RULE OF CONSTRUCTION— The exceptions enumerated under clauses (i) through (v) of subparagraph (A) shall be construed so as not to be in conflict, and no provision of this Act shall be construed to create a public or private cause of action or remedy.

(D) MINOR CHILD EXCEPTION— Nothing in this Act shall be construed to limit the right of a person under 17 years of age to recover damages authorized under Federal or State law in a civil action that meets 1 of the requirements under clauses (i) through (v) of subparagraph (A).

(6) SELLER—The term 'seller' means, with respect to a qualified product—

(A) an importer (as defined in section 921(a)(9) of title 18, United States Code) who is engaged in the business as such an importer in interstate or foreign commerce and who is licensed to engage in business as such an importer under chapter 44 of title 18, United States Code;

(B) a dealer (as defined in section 921(a)(11) of title 18, United States Code) who is engaged in the business as such a dealer in interstate or foreign commerce and who is licensed to engage in business

as such a dealer under chapter 44 of title 18, United States Code; or

(C) a person engaged in the business of selling ammunition (as defined in section 921(a)(17)(A) of title 18, United States Code) in interstate or foreign commerce at the wholesale or retail level.

(7) STATE—The term 'State' includes each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States, and any political subdivision of any such place.

(8) TRADE ASSOCIATION—The term 'trade association' means—

(A) any corporation, unincorporated association, federation, business league, professional or business organization not organized or operated for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;

(B) that is an organization described in section 501(c)(6) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code; and

(C) 2 or more members of which are manufacturers or sellers of a qualified product.

(9) UNLAWFUL MISUSE—The term 'unlawful misuse' means conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product.

SEC. 5. CHILD SAFETY LOCKS.

(a) SHORT TITLE—This section may be cited as the 'Child Safety Lock Act of 2005'.

(b) PURPOSES—The purposes of this section are—

(1) to promote the safe storage and use of handguns by consumers;

(2) to prevent unauthorized persons from gaining access to or use of a handgun, including children who may not be in possession of a handgun; and

(3) to avoid hindering industry from supplying firearms to law abiding citizens for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

(c) FIREARMS SAFETY—

(1) MANDATORY TRANSFER OF SECURE GUN STORAGE OR SAFETY DEVICE—Section 922 of title 18, United States Code, is amended by inserting at the end the following:

'(z) SECURE GUN STORAGE OR SAFETY DEVICE—

'(1) IN GENERAL—Except as provided under paragraph (2), it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer any handgun to any person other than any person licensed under this chapter, unless the transferee is provided with a secure gun storage or safety device (as defined in section 921(a)(34)) for that handgun.

'(2) EXCEPTIONS—Paragraph (1) shall not apply to—

'(A)(i) the manufacture for, transfer to, or possession by, the United States, a department or agency of the United States, a State, or a department, agency, or political subdivision of a State, of a handgun; or

'(ii) the transfer to, or possession by, a law enforcement officer employed by an entity referred to in clause (i) of a handgun for law enforcement purposes (whether on or off duty); or

'(B) the transfer to, or possession by, a rail police officer employed by a rail carrier and certified or commissioned as a po-

lice officer under the laws of a State of a handgun for purposes of law enforcement (whether on or off duty);

'(C) the transfer to any person of a handgun listed as a curio or relic by the Secretary pursuant to section 921(a)(13); or

'(D) the transfer to any person of a handgun for which a secure gun storage or safety device is temporarily unavailable for the reasons described in the exceptions stated in section 923(e), if the licensed manufacturer, licensed importer, or licensed dealer delivers to the transferee within 10 calendar days from the date of the delivery of the handgun to the transferee a secure gun storage or safety device for the handgun.

'(3) LIABILITY FOR USE—

'(A) IN GENERAL—Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action.

'(B) PROSPECTIVE ACTIONS—A qualified civil liability action may not be brought in any Federal or State court.

'(C) DEFINED TERM—As used in this paragraph, the term 'qualified civil liability action'—

'(i) means a civil action brought by any person against a person described in subparagraph (A) for damages resulting from the criminal or unlawful misuse of the handgun by a third party, if—

'(I) the handgun was accessed by another person who did not have the permission or authorization of the person having lawful possession and control of the handgun to have access to it; and

'(II) at the time access was gained by the person not so authorized, the handgun had been made inoperable by use of a secure gun storage or safety device; and

'(ii) shall not include an action brought against the person having lawful possession and control of the handgun for negligent entrustment or negligence per se.'.

(2) CIVIL PENALTIES—Section 924 of title 18, United States Code, is amended—

(A) in subsection (a)(1), by striking 'or (f)' and inserting '(f), or (p)'; and

(B) by adding at the end the following:

'(p) PENALTIES RELATING TO SECURE GUN STORAGE OR SAFETY DEVICE—

'(1) IN GENERAL—

'(A) SUSPENSION OR REVOCATION OF LICENSE; CIVIL PENALTIES—With respect to each violation of section 922(z)(1) by a licensed manufacturer, licensed importer, or licensed dealer, the Secretary may, after notice and opportunity for hearing—

'(i) suspend for not more than 6 months, or revoke, the license issued to the licensee under this chapter that was used to conduct the firearms transfer; or

'(ii) subject the licensee to a civil penalty in an amount equal to not more than $2,500.

'(B) REVIEW—An action of the Secretary under this paragraph may be reviewed only as provided under section 923(f).

'(2) ADMINISTRATIVE REMEDIES—The suspension or revocation of a license or the imposition of a civil penalty under paragraph (1) shall not preclude any administrative remedy that is otherwise available to the Secretary.'.

(3) LIABILITY; EVIDENCE—

(A) LIABILITY—Nothing in this section shall be construed to—

(i) create a cause of action against any Federal firearms licensee or any other person for any civil liability; or

(ii) establish any standard of care.

(B) EVIDENCE—Notwithstanding any other provision of law, evidence regarding compliance or noncompliance with the amendments made by this section shall not be admissible as evidence in any proceeding of any court, agency, board, or other entity, except with respect to an action relating to section 922(z) of title 18, United States Code, as added by this subsection.

(C) RULE OF CONSTRUCTION— Nothing in this paragraph shall be construed to bar a governmental action to impose a penalty under section 924(p) of title 18, United States Code, for a failure to comply with section 922(z) of that title.

(d) EFFECTIVE DATE—This section and the amendments made by this section shall take effect 180 days after the date of enactment of this Act.